# In the United States Court of Federal Claims

NEWIMAR S.A.,

               Plaintiff,

               v.

THE UNITED STATES,

               Defendant,

               and

J&J MAINTENANCE, INC.,

               Intervenor-Defendant.

No. 21-cv-1897

Filed Under Seal: May 12, 2022

Publication: May 19, 2022[1]

*Laurence Schor*, Asmar, Schor & McKenna, PLLC, Washington, District of Columbia for Plaintiff.

*Sonia M. Orfield*, United States Department of Justice, Civil Division, Washington, District of Columbia for Defendant.  With her on the briefs are *Brian M. Boynton*, Acting Assistant Attorney General, Civil Division; *Patricia M. McCarthy*, Director, Commercial Litigation; *Steven J. Gillingham*, Assistant Director, Commercial Litigation; *Christopher J. Robbins* and *Nicolle A. Vasquez*, Naval Facilities Engineering Systems Command Atlantic.

*Adam K. Lasky*, Seyfarth Shaw LLP, Seattle, Washington for Intervenor-Defendant.  With him on the briefs is *Stephanie B. Magnell*, Seyfarth Shaw LLP, Washington, District of Columbia.

---

[1] This Memorandum and Order was filed under seal in accordance with the Protective Order entered in this case (ECF No. 12) and was publicly reissued after incorporating all redactions proposed by the parties.  (ECF No. 62.)  The sealed and public versions of this Memorandum and Order are otherwise identical, except for the publication date and this footnote.

## MEMORANDUM AND ORDER

Known as "the Gateway to the Mediterranean," U.S. Naval Station (NAVSTA) Rota is located along the Bay of Cádiz in Rota, Spain.[2]  It is a strategic base that supports U.S. and allied operations in Europe, Africa, and the Middle East.[3]  The base is owned by Spain, but the U.S. and Spanish navies share facilities under the Agreement on Defense Cooperation.[4]  While it does not own the base, the U.S. Navy is responsible for maintaining the base's infrastructure, "including a 670-acre airfield, four active piers, hundreds of facilities and approximately 373 family housing units."[5]

Such maintenance requires significant assistance from civilian contractors.  Plaintiff Newimar S.A., which has served as one of those contractors for over 30 years, filed this post-award bid protest to challenge an award by Defendant United States, acting through the U.S. Department of the Navy (Navy), to Intervenor-Defendant J&J Maintenance, Inc. (J&J)[6] for base operations support services at U.S. Naval Station Rota.  Plaintiff's Complaint (ECF No. 1) (Compl.) ¶ 2-3.  Newimar opposes the award to J&J as arbitrary, capricious, not in accordance with the terms of the solicitation, biased, irrational, and in violation of the law.  *Id.* ¶ 72-74.  It requests this Court (i) enjoin the Navy from proceeding with its award to J&J and (ii) require the Navy to award a new contract after re-evaluating the previously submitted bids.  *Id.* ¶ 76.

---

[2] *Welcome Aboard: Rota*, NAVSTA Rota Public Affairs, 3 (2019), available at https://issuu.com/navstarota/docs/wap2019_final (last accessed May 11, 2022).

[3] *Id.* at 4.

[4] *Id.*

[5] *Id.*

[6] For purposes of bidding on this solicitation, "J&J Maintenance, Inc." was doing business as "J&J Worldwide Services."  Tab 19 at AR 5856.

Pending before the Court are Plaintiff's Motion for Judgment on the Administrative Record (ECF No. 40) (MJAR), Defendant's Cross-Motion for Judgment on the Administrative Record (ECF No. 47) (Def.'s Cross-MJAR), and Intervenor-Defendant's Cross-Motion for Judgment on the Administrative Record (ECF No. 48) (Int.-Def.'s Cross-MJAR).  On January 12, 2022, this Court conducted oral argument on the pending motions.  *See* Transcript of Oral Argument dated January 12, 2022 (ECF No. 58) (Tr. Oral Arg.).  For the reasons explained below and in consideration of the parties' briefs and arguments, this Court **DENIES** Plaintiff's Motion for Judgment on the Administrative Record (ECF No. 40), **GRANTS** Defendant's Cross-Motion for Judgment on the Administrative Record (ECF No. 47), and **GRANTS** Intervenor-Defendant's Cross-Motion for Judgment on the Administrative Record (ECF No. 48).

BACKGROUND[7]

The contract under protest relates to Base Operation Support (BOS) services at U.S. Naval Station Rota.  *See* Tab 16 (Conformed Solicitation No. N62470-19-R-2001 (September 18, 2020)) at Administrative Record (AR) 5155.  Such services include facility management and investment, aviation fuel support, custodial services, housing maintenance, grounds keeping, and pest control, among other services.  *See id.* at AR 5170.  This procurement has already brought the parties before the U.S. Court of Federal Claims once before a different judge of this court.  *See Newimar, S.A. v. United States*, 152 Fed. Cl. 521 (2021).  As described below in further detail, following corrective

---

[7] This section contains the Court's findings of fact derived from the Administrative Record (AR). The AR is contained in ECF Nos. 21-1 – 25-5, 31, 35, 42, 43, and 46.  Documents within the Administrative Record are divided into "Tabs."  An index of the Administrative Record's tabs can be found at ECF No. 46.

action by the Navy and a re-award of the BOS services contract to J&J, Newimar filed the present action.

    I.    <u>Original Solicitation and Award</u>

On September 18, 2019, the Navy issued solicitation No. N62470-19-R-2001 (Original Solicitation or Original RFP) for the BOS services.  The Navy amended the Original Solicitation seven times.  *See* Tab 9 (Solicitation Amendment 0001 (October 3, 2019)) – Tab 15 (Solicitation Amendment 0007 (October 30, 2019)).  Accordingly, the term "Original Solicitation" in this Memorandum and Order references the conformed solicitation (Tab 16) incorporating all seven amendments. The Original Solicitation provided for a single award, fixed-price, indefinite delivery-indefinite quantity (IDIQ) contract that included contract line items (CLINs) for both recurring work (RW) and non-recurring work (NRW).  Tab 8 (Solicitation No. N62470-19-R-2001 (September 18, 2020)) at AR 61-62.  The IDIQ contract included a 12-month base term with six 12-month option periods and three six-month option periods.  *Id.*

The Original Solicitation required the Navy to make an award using a best-value tradeoff analysis.  Tab 8 at AR 432.  Specifically, the Navy was required to establish that prices were fair and reasonable using one or more of the following techniques: (i) comparison of the proposed prices received from offerors, (ii) comparison of the offerors' proposed prices with an Independent Government Cost Estimate (IGCE), (iii) comparison of the offerors' proposed prices with historical information, (iv) comparison of market survey results, or (v) fair and reasonable CLIN and exhibit line item (ELIN)/unit pricing.  *Id.*  The Original Solicitation required balancing price against four non-price evaluation factors: Corporate Experience (Factor 1), Staffing Approach (Factor 2), Safety (Factor 3), and Past Performance (Factor 4).  Tab 8 at AR 432-34.  The Original Solicitation explained that "all technical factors and past performance/performance confidence

assessment factors combined (*i.e.*, the non-price evaluation factors) are significantly more important than price." *Id*. at AR 432.  However, the Original Solicitation also explained that "[t]he importance of price will increase if the Offerors' non-price proposals are considered essentially equal in terms of overall quality." *Id*. at AR 419.

Newimar and J&J timely submitted proposals in response to the Original Solicitation.  *See* Tab 20 (Newimar, S.A. (November 14, 2019)) at AR 7475 and Tab 19 (J&J Worldwide Services (November 14, 2019)) at AR 5856 respectively.  The Navy's Price Evaluation Team (PET) validated Newimar's bid at $152,842,464.98, while it validated J&J's bid at $156,375,285.95.  Tab 22 (Source Selection Evaluation Board Documentation (April 8, 2020))  at AR 7531.  Although J&J's bid was higher than Newimar's, the Navy selected J&J for the award.  Tab 24 (Source Selection Decision Document (April 22, 2020)) at AR 7789.  The Source Selection Authority (SSA) concluded that Newimar's bid was "unawardable based [on] the presence of one (1) or more Unacceptable ratings among the technical factors." *Id*. at AR 7791.  Specifically, Newimar had received an "Unacceptable" rating for its staffing approach.  *Id.*

II.    Protest of the Original Award

Dissatisfied with the outcome, Newimar sought clarification through the agency debriefing process.  *See* Tab 33 (Post-Award Debriefing (August 3, 2021)); Tab 34 (Newimar Email Transmittal - Additional Debriefing Questions (August 5, 2021)); Tab 35 (Agency Response to Newimar Questions (August 7, 2020)).  Newimar then challenged the award in a protest at the Government Accountability Office (GAO).  Tab 38 (Protest of Newimar, S.A. (August 12, 2020)). The GAO dismissed Newimar's protest because Newimar's bid did not conform to a material term of the Original Solicitation — providing aviation fuel support staff 24 hours per day, 7 days per

week — and therefore Newimar could not prevail on its claim.  Tab 41 (GAO Decision (November 12, 2020)) at AR 9951-52.

Subsequently, Newimar filed a bid protest at the United States Court of Federal Claims. *Newimar*, 152 Fed. Cl. 521.  In a motion for judgment on the administrative record filed in that proceeding, Newimar argued, *inter alia*, that the Navy's award was improper because "J&J's proposal also contained less than the minimum required number of staffing hours for Aviation Fuel Support, but . . .  the Navy did not assess it a deficiency." *Id.* at 523.  In response, the Navy took corrective action and cancelled the contract award to J&J. *Id.*  The court dismissed Newimar's protest because the Navy's corrective action mooted Newimar's claims. *Id.* at 524.

## III.   Corrective Action

Following cancellation of the original award to J&J, the Navy revised the Source Selection Plan to replace some of the individuals involved in the procurement, including the Contract Specialist, the Division Director of the Source Selection Advisory Council (SSAC), members of the Source Selection Evaluation Board (SSEB), and an Advisor.  Tab 43 (Addendum 003 – Source Selection Plan (March 5, 2021)) at AR 9980.  These changes were made "[a]s a result of suggestions noted during solicitation reviews, lessons learned from other source selections, and redistribution of internal workload." *Id.*  After obtaining a new IGCE, the recomposed evaluation team set out to reevaluate the bids. *See* Tab 44 (Revised Independent Government Cost Estimate); Tab 45 (Source Selection Evaluation Board Documentation (May 4, 2021)).

The Source Selection Evaluation Board reexamined the bids and issued new price-evaluation-team and technical-evaluation-team reports.  Tab 45.  Based on those reports, the Source Selection Advisory Council recommended "that the SSA establish a competitive range comprised of two (2) offerors, J&J and Newimar." Tab 46 (Source Selection Authority Council Report – Competitive Range (May 7, 2021)) at AR 10597.  While both Newimar and J&J's

proposals received an "Unacceptable" rating for their staffing approach (Factor 2), the SSAC believed that the two offerors could correct their deficiencies in Factor 2 through discussions. *Id.* at AR 10592, 10594. In summary, the SSAC concluded that "[t]hese two (2) offerors provided the strongest non-price proposals when considering the ability to address issues via discussions and proposed competitive pricing." *Id.* at AR 10597. Concurring with the SSAC's conclusions, the SSA established a competitive range with J&J and Newimar and approved entering discussions with both offerors. Tab 47 (Competitive Range Decision Document (May 12, 2021)) at AR 10598, 10607.

IV.   Revised Solicitation

     During discussions with J&J and Newimar, the Navy amended the Original Solicitation twice, resulting in the Revised Solicitation at the center of this protest. *See* Tab 50 (Solicitation Amendment 0008 (June 2, 2021)) at AR 10685-11016; Tab 54 (Email Transmittal (with receipt confirmation) – Amendment 0010 (June 11, 2021)).[8] The Revised Solicitation is largely the same as the Original Solicitation. *Compare* Tab 16, *with* Tab 50 at AR 10688-11016, *and* Tab 54. Under the Revised Solicitation, the awarded contract would still be "a single award Firm Fixed Price (FFP), Indefinite Delivery-Indefinite Quantity (IDIQ), performance-based type contract that is comprised of both Recurring and Non-Recurring Work items." Tab 50 at AR 10688. The Revised Solicitation also still provided "for one Base Period of up to 12 months with six (6) 12 month Option Periods, and three (3) six-month Option Periods." *Id.* at AR 10689. Three major aspects of the Revised Solicitation — the contract's service requirements, the basis on which the offers

---

[8] References throughout this Memorandum and Order to the "Revised Solicitation" refer to the Original Solicitation (Solicitation No. N62470-19-R-2001 (Tab 16)) as modified by Amendment 0008 (Tab 50) and Amendment 0010 (Tab 54 Solicitation Amendment 0010 at AR 11712-11714).

would be evaluated, and the proposal submission requirements — differed from the Original Solicitation and warrant more attention.[9]

    A.  <u>Service Requirements</u>

The Revised Solicitation's Section C includes a performance work statement listing various service requirements that "must be met" by the contractor.  Tab 16 at AR 5170; Tab 50 at AR 10691-701.  Specifically, it states that "the Contractor shall furnish all labor, supervision, management, tools, materials, equipment, facilities, transportation, incidental engineering, and other items necessary to provide the services" in the work statement.  Tab 16 at AR 5171.  Most relevant here is a requirement concerning pest control services.  *See id*. at AR 5420.

In addition to standards for implementing a pest control plan, the work statement includes a variety of certification, training, license, and permit requirements for the pest control services. *See id*. at AR 5421-22.  For example, all contractor personnel applying pesticides are required to "comply with certification requirements in DoD Environmental Final Governing Standards (FGS) Spain Chapter 11 – Pesticides, . . . be licensed by the Spanish government to provide pest control in the categories specified in this contract, and . . . be registered with the applicable Chamber of Commerce for pest management work."  *Id*. at AR 5422.  The contractor is further required to "obtain all necessary permits required to perform the work in this contract" and "possess a business license issued by the Spanish applicable authority to provide pest control services."  *Id.*

The Original Solicitation required the contractor to provide the Navy with proof of pesticide certification and training "15 calendar days prior to start of work," pesticide permits "5

---

[9] Several provisions of the Original Solicitation that were not altered by Amendments 0008 or 0010 were not reproduced in the copies of those amendments.  While for the sake of clarity such provisions are referenced in this Memorandum and Order as provisions of the Revised Solicitation, the Court cites the Original Solicitation where appropriate for those unchanged provisions not fully reproduced in the amendments.

days prior to the start of work requiring permits," and local/state business licenses "[p]rior to contract award."   Tab 13 (Solicitation Amendment 0005 (October 23, 2019)) at AR 3777 (Attachment F); *see* Tab 16 at AR 5422 (requiring proof of licenses, permits, certification, and training "per Section F"),AR 5484-86 (indicating in Section F that deliverables for pest control are provided in Attachment F), AR 5507 (incorporating by reference Attachment F).   These deadlines are largely the same in the Revised Solicitation, with the notable exception that the Navy amended the deadline for submitting local/state business licenses so that the contractor needed only to provide a copy of their business license(s) "[p]rior to the start of performance," rather than prior to the award.   Tab 50 at AR 10746.   The Administrative Record does not include evidence that J&J possessed applicable state and/or local pest control licenses at the time of its bid submission. *See generally* Tab 19 (J&J's initial proposal); Tab 55 (Final Proposal Revisions – J&J Worldwide Services (June 16, 2021)) (J&J's revised proposal).

   B.   <u>Basis of Evaluation</u>

   The Navy elected to use a tradeoff process to award the contract in dispute, stating that it "considers it to be in its best interest to allow consideration of award to other than the lowest priced offeror or other than the highest technically rated offeror."   Tab 50 at AR 10730.   The Revised Solicitation warned offerors that "[a]ny proposal found to have a deficiency in meeting the stated solicitation requirements or performance objectives will be considered ineligible for award, unless the deficiency is corrected through discussions."   *Id.* at AR 10731.   Again, while much of the Revised Solicitation is identical to the Original Solicitation, *compare* Tab 16, *with* Tab 50, *and* Tab 54, the Navy clarified when it sent offerors the amendments creating the Revised Solicitation that the Navy would "not evaluate information within prior proposals submitted in response to

th[e] solicitation."   Tab 52 (Email Transmittal to Newimar - Request for Final Proposal Revisions (June 2, 2021)) at AR 11370.

Ultimately, the Navy explained that it would "award the contract to the offeror submitting the proposal determined to represent the best value — the proposal most advantageous to the Government, price and other factors considered."  Tab 50 at AR 10730.  The Revised Solicitation explicitly defined how it would evaluate those factors.  *See id.* at AR 10731-33.  The most relevant evaluation factors are explained below.

### i.   Price Evaluation

The Revised Solicitation explains that the Navy would evaluate offers "based on the total price," which "consists of the basic requirements and all option items."  Tab 50 at AR 10731.  The Navy stated it would "ensure a fair and reasonable price" by analyzing the offers with one or more of the following techniques:

  i.  Comparison of proposed prices received in response to the RFP.
 ii.  Comparison of proposed prices with the IGCE.
iii.  Comparison of proposed prices with available historical information.
iv.  Comparison of market survey results.
 v.  Fair and reasonable CLIN and ELIN/unit pricing.

*Id.* at AR 10731.  These evaluation factors remained unchanged from the Original Solicitation. Tab 16 at AR 5549.  As in the Original Solicitation, the Revised Solicitation stated that "[t]he importance of price will increase if the Offerors' non-price proposals are considered essentially equal in terms of overall quality, or if price is so high as to significantly diminish the value of a non-price proposal's superiority to the Government."  Tab 50 at AR 10723.

### ii.   Non-Price Evaluation

While the evaluation factors for price proposals remained unchanged, the Navy made significant changes to the non-price evaluation factors in the Revised Solicitation.  The most significant change entailed elimination of Factor 2 — Staffing Approach.  Tab 50 at AR 10732.

The SSA had recommended eliminating that factor because both offerors in the competitive range — J&J and Newimar — were deficient in that category during the initial evaluation, and the SSA believed that both offerors' "deficiencies under this Factor could be easily corrected without representing a risk of unsuccessful performance going forward."  Tab 47 at AR 10607.  Thus, under the Revised Solicitation, the Navy only evaluated Factors 1 (Corporate Experience), 3 (Safety), and 4 (Past Performance).  *See* Tab 50 at AR 10723, 10731-33.  The Revised Solicitation expressly stated that such factors combined "are significantly more important than price."  *Id.* at AR 10723.

1. Factor 1 – Corporate Experience

The Corporate Experience factor "pertains to the types of work and volume of work completed by a contractor that are comparable to the types of work covered by this requirement, in terms of size, scope, and complexity."  Tab 50 at AR 10723.  The Navy explained that it would use "recent and relevant experience" to evaluate the offerors' ability to meet the solicitation requirements.  *Id.* at AR 10731.  To facilitate the Navy's evaluation, offerors were required to submit, *inter alia*, at least two recent and relevant projects, but no more than five projects.  *Id.* at AR 10731-32.  Furthermore, the Navy would only evaluate information provided on Attachment J-2, discussed below in more detail, with respect to submittal instructions.  *Id.* at AR 10732.

The Revised Solicitation explained that "[r]ecent and relevant projects must be of similar size, scope, and complexity to this requirement and must meet the recency and relevancy requirements provided in the submittal requirements for this factor."  *Id.*  Additionally, the Navy stated it would "consider the depth and breadth of the relevant experience, focusing on performance of technical specifications to be performed under this contract, to evaluate the level of risk of unsuccessful performance."  *Id.*  The Navy also reserved the right to consider more recent

projects more favorably than older projects. *Id.* Finally, the Navy explained that projects where the offeror acted as a prime contractor may be viewed more favorably than projects where the offeror acted as a subcontractor, and that projects performed by the offeror may be viewed more favorably than those performed by a proposed subcontractor or affiliate. *Id.*

## 2. Factor 3 – Safety

The Safety factor examined "the degree to which subcontractor safety performance (if subcontractors are utilized) will be considered in the selection of all levels of subcontractors on the upcoming contract and the degree to which [the offeror] will monitor the safety performance of its own employees and its subcontractors during performance." Tab 50 at AR 10733. The Revised Solicitation explained that this factor "will be rated Acceptable or Unacceptable." *Id.* at AR 10723, 10731. Accordingly, if an offeror received an "Unacceptable" for this factor, it would be ineligible for award "unless discussions are conducted and the Unacceptable rating is corrected through discussions and proposal revisions." *Id.* at AR 10723, 10731.

## 3. Factor 4 – Past Performance

The Past Performance factor "pertains to both the relevance of recent efforts and how well a contractor has performed on contracts." Tab 50 at AR 10723. The Navy explained that it would evaluate the recent and relevant projects offerors submitted under Factor 1 and noted that it may analyze unsubmitted information "documented in known sources." *Id.* at AR 10733. It further explained that it "will consider the recency and degree of similarity, using the parameters established in Factor 1, between the project and the subject contract." *Id.*

The Revised Solicitation also explained that the Navy would use the offerors' "past performance evaluations and all other past performance information reviewed by the Government"

to evaluate whether an offeror has "a trend of satisfactory performance." *Id.* The following factors would be used to look for such a trend:

- A pattern of successful completion of tasks;
- A pattern of deliverables that are timely and of good quality;
- A pattern of cooperativeness and teamwork with the Government at all levels (task managers, contracting officers, auditors, etc.); and
- Recency of tasks performed that are identical to, similar to, or related to the task at hand.

*Id.* Finally, the Revised Solicitation explained that a past project with little or no information available related to past performance "will receive a Neutral Confidence Rating." *Id.*

### 4.   Relative Weight of the Factors

In addition to eliminating Factor 2 as an evaluation point for the non-price proposals, the Revised Solicitation made notable changes to the balance of the remaining non-price factors. Instead of Factors 1 and 2 combined being of equal importance to Factor 4, the Revised Solicitation stated that "Factor 1 is of equal in [sic] importance to the past performance evaluation/performance confidence assessment Factor 4." Tab 50 at AR 10723.

### iii.   Responsibility Evaluation

Even if an offeror presents the best value to the Navy based on its price and non-price proposals, it cannot receive an award if the Navy determines it is not a responsible offeror. Tab 50 at AR 10723. The Revised Solicitation stated that the Navy will evaluate responsibility "in

accordance with FAR Part 9, specifically 9.104-1." *Id.* at AR 10725.   For an offeror to be considered responsible under that regulation, it must:

> (a) Have adequate financial resources to perform the contract, or the ability to obtain them (see 9.104-3(a));
>
> (b) Be able to comply with the required or proposed delivery or performance schedule, taking into consideration all existing commercial and governmental business commitments;
>
> (c) Have a satisfactory performance record . . . ;
>
> (d) Have a satisfactory record of integrity and business ethics . . . ;
>
> (e) Have the necessary organization, experience, accounting and operational controls, and technical skills, or the ability to obtain them . . . ;
>
> (f) Have the necessary production, construction, and technical equipment and facilities, or the ability to obtain them . . . ; and
>
> (g) Be otherwise qualified and eligible to receive an award under applicable laws and regulations.

FAR § 9.104-1.   The Revised Solicitation did not mention compliance with local, foreign laws or regulations as an additional responsibility criterion.  Tab 50 at AR 10725.   Instead, the Revised Solicitation required bidders to submit local/state business licenses *"[p]rior to the start of performance*."   *Id.* at AR 10746 (emphasis added).   Essentially, the Revised Solicitation revised the license requirement to be a post-award, pre-performance requirement.   In response to questions about the Original Solicitation — which was also silent regarding compliance with local laws and regulations for the responsibility determination, *see* Tab 16 at AR 5540 — the Navy explained that "[t]he awardee," not offerors, "will be responsible for complying with Spanish law as stated throughout the solicitation."   *Id.* at AR 5516.   Offerors needed only to comply with the solicitation in which "[t]he Government has provided sufficient information . . . for offerors to prepare price proposals."   *Id.*

C.  Instructions and Conditions

The Navy set a deadline of June 16, 2021, for J&J and Newimar to submit final revised proposals.  Tab 50 at AR 10686.  The Revised Solicitation included several notable requirements for the offerors' price submittals and non-price submittals.  *Id.* at AR 10723-30.

i.  Price Submittals

Under the Revised Solicitation, each offeror was required to submit an attachment with pricing for 20 CLINs and a separate attachment with proposed unit prices for numerous ELINs. Tab 50 at AR 10724.  If the offeror relied upon a subsidiary or affiliate for resources, it had to identify each such entity.  *Id.*  The offeror was also required to include a narrative "that clearly demonstrates that the affiliates/subsidiaries . . . will have meaningful involvement in this contract." Tab 50 at AR 10725.  The narrative also had to "state specific commitments of resources (e.g., personnel, equipment)" that the subsidiary or affiliate would provide, along with a description of the work that the subsidiary or affiliate would perform or manage on behalf of the offeror.  *Id.*

While not evaluated as part of the price proposal, each offeror was required to submit several documents along with its price proposal that would serve as the basis for the Navy's responsibility determination.  *Id.* The Revised Solicitation requested three classes of information: (i) "the latest three complete fiscal year financial statements for the prime contractor," (ii) "[o]ne (1) signed Bank Reference demonstrating adequate financial resources," and (iii) "[t]hree (3) signed credit references."  *Id.*

ii.  Non-Price Submittals

Turning to non-price submittals, each offeror was required to include the identity of any subcontractor or affiliates and what role they would play if the contractor's proposal relied on the "resources (i.e.: corporate experience) of a . . . subsidiary/affiliate" in its non-price submittal.  Tab

50 at  AR 10726.  The Revised Solicitation also included specific requirements for each of the three factors the Navy would use to evaluate the non-price submittals:  Corporate Experience, Safety, and Past Performance.  *Id.* at AR 10727-29.

### 1.  Factor 1:  Corporate Experience

Under the Corporate Experience factor, each offeror was required to submit no more than "five (5) examples of relevant projects."  Tab at AR 10727.  The Revised Solicitation required the submitted projects to include at least "two (2) recent and relevant projects"; at least "one (1) recent and relevant project demonstrating performance of services comparable to [the Custodial] technical specification 1503010"; and at least "one (1) recent and relevant project demonstrating services comparable to two (2) other annexes/sub-annexes on the same project)," from among the following — aviation fuel support, family housing, facility management, custodial, pest control, integrated solid waste management, grounds maintenance and landscaping, and environmental.  *Id.*

Offerors were permitted to rely on a proposed subcontractor to demonstrate corporate experience but were "still limited to a total of five (5) recent and relevant projects."  Tab 50 at AR 10728.  The Revised Solicitation required the offeror to complete Attachment J-2 Corporate Experience Project Data Sheet, to "clearly explain and demonstrate to the Government how [the offeror's] work experience, and the experience of each Team Member (if applicable), for each submitted project is relevant to the contract requirements in this solicitation."  *Id.*  Notably, Attachment J-2 required the offeror to disclose for each project whether it was the prime or subcontractor, and to state the percentage of work it self-completed.  Tab 8 at AR 443 (Attachment J-2); *see* Tab 50 at AR 10710 (incorporating Attachment J-2 by reference into the Revised Solicitation).

2.   <u>Factor 3:  Safety</u>

The Revised Solicitation also required the offeror to submit a narrative explaining the approach it would "implement to evaluate safety performance of its own employees and its subcontractors (if subcontractors are utilized)."  Tab 50 at AR 10729.  The Revised Solicitation further required offerors to "submit both (1) a plan to include the safety performance of subcontractors in the selection process for all levels of subcontracting (if subcontractors are utilized) and (2) a plan to monitor the safety of its own employees and subcontractors (if contractors are utilized) during contract performance."  *Id.*

3.   <u>Factor 4:  Past Performance</u>

For past performance, the Revised Solicitation required offerors to address "[s]ubmit a completed [Contractor Performance Assessment Rating System (CPARs)] evaluation for each project submitted under Factor 1."  Tab 50 at 10729.  The Revised Solicitation allowed offerors to "provide any information on problems encountered and the corrective actions taken on projects submitted under Factor 1."  *Id.*  It also allowed them to "address any adverse past performance issues."  *Id.*  The Revised Solicitation specified that while the Navy would analyze the past performance information submitted by the offerors, "the Government may review any other sources of information for evaluating past performance."  *Id.*  Those "sources may include, but are not limited to, past performance information retrieved through the Contractor Performance Assessment Rating System (CPARs) . . . , Federal Awardee Performance Integrity Information System (FAPIIS), Electronic Subcontract Reporting System (eSRS), and any other known source not provided by the offeror."  *Id.*

V.   <u>Source Selection Authority's Analysis Following Corrective Action</u>

J&J and Newimar each submitted final revised proposals before the Revised Solicitation's June 16, 2021 deadline.  Tab 55; Tab 56 (Final Proposal Revisions – Newimar, S.A. – Cover Letter

(June 16, 2021)).   Following the SSEB's and the SSAC's proposal evaluations, the SSA "independently analyzed all evaluation and selection information," and recommended awarding the contract to J&J.  Tab 59 (Source Selection Decision Document (August 16, 2021)) at AR 13230.  As detailed below, the SSA determined that J&J's offer was more advantageous on both price and non-price factors.  *Id.* at AR 13234.  Additionally, the SSA reasoned that J&J's bid also met the responsibility requirement and complied with Navy's Agreement on Defense Cooperation. Tab 60 (Responsibility Determination Memorandum & Supporting Documents (August 16, 2021)); Tab 61 (Post-Negotiation Business Clearance Memorandum (August 25, 2021)) at AR 13438; Tab 78 (Memorandum for the Spanish Section of the Permanent Committee (July 21, 2020)); Tab 79 (Navy Email to the Permanent Committee - PC Contract Award Approval (June 23, 2021)).  Accordingly, the SSA concluded that "there is adequate rationale to support the award to J&J . . . without further discussions."  Tab 59 at AR 13235.

     A.   Price Evaluation

     The SSA concluded that both offerors' prices were fair and reasonable, but that J&J offered a less expensive price. Tab 59 at AR 13231.  It found "that the use of comparison amongst offers in price competition and comparison of offers to the Independent Government Cost Estimate (IGCE), are each an adequate price analysis tool to establish price reasonableness."  *Id.*  It also concluded that "neither offer was unbalanced in any respect."  *Id.*  In making these findings, the SSA "concur[ed] with the evaluation of the offerors in the Price Evaluation Findings Report and agree[d] with those evaluations as addressed by the SSAC."  *Id.*

     The SSA cited the SSAC's rationale to support its conclusion that adequate price competition exists.  *Id.*  The SSAC had found adequate price competition given "two (2) offerors submitted prices that addressed all of the price proposal requirements, and while there were minor discrepancies in certain line items, the price evaluation team was able to calculate validated prices

for both offerors in accordance with the RFP." Tab 58 (Source Selection Advisory Council Report (August 11, 2021)) at AR 13225. The SSA then proceeded to compare J&J's price to Newimar's price. Tab 59 at AR 13232. As demonstrated in the below table, J&J's total validated price was 9.64% less expensive than Newimar's validated price.

| Offeror | Total Price | Dollar Difference Greater than Lowest Offeror | Percentage Difference Greater than Lowest Offeror |
|---------|-------------|-----------------------------------------------|---------------------------------------------------|
| J&J | $132,924,532.91 | | |
| Newimar | $145,744,676.24 | $12,820,143.33 | 9.64% |

*Id.*

The SSA also used comparisons to the IGCE to establish that the offerors' prices were fair and reasonable. Tab 59 at AR 13231. The table below illustrates the results of that comparison:

| Offeror | Total Price | Difference from IGCE (Dollars) | Difference from IGCE (Percentage) |
|---------|-------------|--------------------------------|-----------------------------------|
| IGCE | $154,568,221.57 | | |
| J&J | $132,924,532.91 | ($21,643,688.66) | (14.00%) |
| Newimar | $145,744,676.24 | ($8,823,545.33) | (5.71%) |

*Id.* Both offers were more advantageous than the IGCE, with J&J's offer providing a greater price advantage over the IGCE. *Id.*

The SSA references the SSEB's report to support its conclusion "that neither offer was unbalanced in any respect." *Id.* The SSEB's PET had focused its price balancing analysis "on ensuring each offer's pricing is reasonably balanced across the base and all option periods, as well as between Recurring and Non-Recurring Work CLINs." Tab 57 at AR 12884. It also "consider[ed] risk if an instance of material unbalance occurs." *Id.* The PET performed its analysis by:

> calculat[ing] and compar[ing] the percentage variance (difference) between successive Recurring Work (RW) and successive Non-Recurring Work (NRW) CLINs in each offeror's proposal. The PET calculated and compared the annual

percentage variance between each set of successive RW CLINs and between each set of successive NRW CLINs.  Additionally, the PET calculated and compared the percentage variance between the first and last RW CLINs and first and last NRW CLINs.  For those foregoing calculations, the PET used the later occurring CLIN year in each comparison as the basis of comparison (denominator) in the percentage calculation. . . .  After calculating and comparing the variance between CLINs as described above, the PET next calculated the mean and median annual variance between RW CLINs year-by-year and NRW CLINs year-by-year.  Finally, the PET calculated the average and median variances for the following comparisons across both offerors: (1) RW variance between first and last CLIN, (2) NRW variance between first and last CLIN, (3) RW variance between the base and first option CLIN, (4) NRW variance between the base and first option CLIN, (5) the annual variance between each RW CLIN, and (6) the annual variance between each NRW CLIN.  This resulted in eleven (11) across-all-offeror statistics.

*Id.*  The PET found that Newimar's and J&J's pricing each had minute, annual differences between successive RW and NRW CLINs.  Tab 57 at AR 12884-85.  For example, Newimar's "largest NRW CLIN variance between any two consecutive performance periods was a 1.5% increase between CLIN 0014 and the adjusted amount of CLIN 0016," and J&J's "largest NRW CLIN variance between any two consecutive performance periods was a ██% increase between CLIN 0014 and the adjusted amount of CLIN 0016."  *Id.* at AR 12885.

The SSEB had also "valuated the price difference between the RW and NRW within the base period and each option year."  *Id.*  It found that both offerors' pricing reasonably balanced RW and NRW within each period of performance.  *Id.*  Although J&J's pricing distributed less cost to NRW than did the IGCE, the SSEB concluded that the "approximately seven (7) percent" variance from the IGCE in comparable CLINs "are relatively minor and not significant enough for the PET to conclude that a lack of balance is present."  *Id.*  Similarly, while Newimar's pricing distributed more cost to NRW than the IGCE, the SSEB reasoned that an "approximately two (2) percent" variance from the IGCE in comparable CLINs is "also relatively minor and not significant enough for the PET to conclude that a lack of balance is present."  *Id.*  Thus, the SSEB concluded that "neither of the offerors were found to have overstated or understated their RW or NRW pricing

in an unbalanced manner." *Id.* The SSEB also noted that "the balance of prices between the RW and NRW within each performance period is remarkably consistent throughout for both offerors, in that neither offeror's RW or NRW percentage varied more than two-hundredths of a percent year-over-year." Tab 57 at AR 12886. As the SSEB concluded that neither offeror submitted unbalanced pricing, it concluded that "a determination of the risk that flowed from unbalanced pricing is unnecessary." *Id.* The SSAC and the SSA independently adopted the SSEB's price findings. *See* Tab 58 Tab 59.

     B.  <u>Technical Evaluation</u>

The SSA likewise concurred with and validated the SSEB's and SSAC's non-price conclusions. Tab 59 at AR 13231. It "agree[d] with the technical evaluations, the strengths, weaknesses, deficiencies, and ratings for each factor, and with the past performance confidence assessments as addressed by the SSEB for each offeror." *Id.* Those results, discussed in more detail below, are summarized in the following table:

| Non-Price Evaluation Summary Chart | | | | |
|---|---|---|---|---|
| **Offerors** | **Factor 1 Corporate Experience** | **Factor 2 RESERVED\*** | **Factor 3 Safety** | **Factor 4 Past Performance** |
| J&J Maintenance, Inc. dba J&J Worldwide Services (J&J) | Outstanding | Reserved* | Acceptable | Substantial Confidence |
| Newimar, S.A. (Newimar) | Outstanding | | Acceptable | Substantial Confidence |

*NOTE: The Government removed Factor 2 from evaluation via Amendment 0008 to the solicitation.

*Id.*

     i.  <u>Factor 1:  Corporate Experience</u>

The SSEB rated both offerors "Outstanding" for Corporate Experience. Tab 57 at AR 13193, 13206. All four projects that J&J submitted in satisfaction of this factor "were recent and relevant," and all four "were offered as experience for the Offeror." *Id.* at AR 13193. J&J self-

performed 75% of the work on its first project, *id.* at AR 13195; 97% of the work on its second project, *id.* at AR 13198; 91% of the work on its third project, *id.* at AR 13200; and 90% of the work on its fourth project.[10] *Id.* at AR 13204.  The SSEB also considered the two projects Newimar submitted to satisfy this factor's "recent and relevant projects."  *Id.* at AR 13206.  Newimar self-performed 83% of the work on its first project, and 85% of the work on its second project.  *Id.* at AR 13207, 13209.

### ii.  Factor 3:  Safety

The SSEB rated both offerors "Acceptable" for Safety.  Tab 57 at AR 13211-12.  Both proposals met the requirements of the Revised Solicitation, and the SSEB found the risk of unsuccessful performance "no worse than moderate."  *Id.*

### iii.  Factor 4:  Past Performance

The SSEB likewise gave J&J and Newimar identical "Substantial Confidence" adjectival ratings for Past Performance.  Tab 57 at AR 13213, 13215.  J&J submitted four projects for consideration.  *Id.* at AR 13213.  "Both the consistency and degree of the positive ratings on two (2) very relevant contracts (Projects 1 and 4) and two (2) relevant contracts (Projects 2 and 3) led the Government to develop a high expectation that J&J will successfully perform the required effort."  *Id.*  Newimar submitted two projects for consideration.  *See* Tab 57 at AR 13214.  "Both the consistency and degree of the positive ratings on the two (2) very relevant contracts led the Government to develop a high expectation that NEWIMAR will successfully perform the required effort."  *Id.*

---

[10] The "self-performed" work on the fourth project was performed by a joint venture, ██████ "which consists of J&J Worldwide Services ██████ and ██████████████."  Tab 57 at AR 13204.

C.  Best Value Determination

After conducting an "independent review of each offeror's proposal, the SSEB report, and the SSAC report," the SSA concluded that J&J was "the number one (1) overall ranked Offeror in the best value analysis, considering both price and non-price factors."  Tab 59 at AR 13232-33. The table below summarizes the SSA's evaluation:

| EVALUATION SUMMARY CHART | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Offerors | Factor 1. Corporate Experience | Factor 2. RESERVED* | Factor 3. Safety | Factor 4. Past Performance | Overall Technical Rating | Validated Price (Total Price for All CLINS) | Price Ranking | Overall Ranking |
| J&J Maintenance, Inc. dba J&J Worldwide Services (J&J) | Outstanding | Reserved* | Acceptable | Substantial Confidence | Outstanding | $132,924,532.91 | 1 | 1 |
| Newimar, S.A. (Newimar) | Outstanding | | Acceptable | Substantial Confidence | Outstanding | $145,744,676.24 | 2 | 2 |
| Independent Government Cost Estimate (IGCE) | | | | | | $154,568,221.57 | | |

*NOTE: The Government removed Factor 2 from evaluation via Amendment 0008 to the solicitation.

*Id.* at AR 13232.

While the offerors received identical adjectival ratings on Factor 1 (Corporate Experience), the SSA "considered J&J to have a slight advantage over Newimar."  *Id.* at AR 13234.  It reasoned "that while both offerors demonstrated experience in performing each of the technical specifications required by this contract, J&J's corporate experience shows a greater breadth of experience over Newimar with four (4) relevant projects compared to the two (2) relevant projects offered by Newimar."  *Id.* at AR 13233.  The SSA also noted "that while Newimar's project no. 2 was relevant it was not particularly recent having completed performance in December of 2014, and the solicitation states that projects performed more recently may be considered more favorably."  *Id.*  The SSA then explained that it considered "the degree of self-performance on each project and noted that J&J self-performed 97% and 91% of the work respectively on projects

2 and 3 where they performed individually as a prime, and self-performed 75% and 90% of the work respectively on projects 1 and 4 where they performed as part of a Joint Venture, which was, on average, slightly higher than the 83% and 85% of the work self-performed on each of Newimar's two projects." Tab 61 at 13436. While J&J's higher degree of self-performance offered "some minor value," the SSA determined that "Newimar's history of performing at NS Rota did not add any more value for the Government than J&J's demonstrated capability of performing on projects with essentially the same scope of services at locations around the world." Tab 59 at AR 13233-34.

The SSA again found distinctions between the offerors on Factor 4 (Past Performance) even though J&J and Newimar both received "Substantial Confidence" ratings. *Id.* at AR 13234. The SSA reasoned that "J&J has consistently received positive ratings on four (4) contracts (two (2) Very Relevant projects and two (2) Relevant), whereas Newimar has consistently received positive ratings on two (2) Very Relevant contracts." *Id.* Additionally, the SSA stated that although "J&J's individually performed projects (Projects 2 and 3) demonstrated a lower degree of relevancy than those performed by Newimar (Projects 1 and 2), J&J's individually performed projects contained almost exclusively Exceptional CPARS ratings where Newimar's projects contained primarily Very Good CPARS ratings." *Id.* The SSA discounted one of Newimar's projects as "not particularly recent" given its December 31, 2014 completion date. *Id.* In contrast, both of J&J's projects performed as part of a joint venture were rated "Very Relevant" and "contained primarily Very Good and Exceptional CPARS ratings (for Project 1) and exclusively Very Good CPARS ratings (for Project 4)." *Id.* Thus, the SSA concluded, "J&J held a significant

advantage over Newimar for this factor" given "J&J's performance record demonstrates consistently higher ratings on a greater number of more recent projects." *Id.*

Finally, the SSA holistically compared the offerors' prices and compared the offerors' combined price and non-price proposals. *Id.* It concluded that "J&J has an advantage in every factor of this analysis (Factor 1, Factor 4, and Price)." *Id.* As J&J held a slight advantage over Newimar on Factor 1 and a significant advantage over Newimar on Factor 4 — two factors that the Revised Solicitation weighted equally — the SSA concluded that "J&J has an advantage over Newimar on the non-price factors combined." *Id.* The combination of J&J's more advantageous price and stronger non-price factors led the SSA to determine "that J&J's proposal represents the best value to the Government of these two offerors." *Id.*

D. <u>Responsibility Determination</u>

The Navy used a pre-award survey to determine whether J&J met the responsibility requirements defined in "FAR 9.104-1 (a) through (g) and FAR 9.104-6." Tab 60 at AR 13236. Based on its review of J&J's submitted financial statements, the Navy concluded "that J&J has adequate financial resources and/or the ability to obtain financial resources to perform subject contract." *Id.* It also concluded that J&J "has demonstrated, through a history of successful performance of comparable projects, the ability to comply with the performance schedules." *Id.* Furthermore, it found that J&J "has a satisfactory performance record," "a satisfactory record of integrity and business ethics," and "the necessary skills and controls required to perform the services." Tab 60 at AR 13237.

The Navy also confirmed that J&J was otherwise eligible to receive a contract award under applicable laws and regulations. *Id.* J&J was registered in the System for Award Management, and it and its officers were "not currently debarred or excluded from receiving a Government

contract [and] have [not] been suspended, or debarred and removed within the previous two years." *Id.* Furthermore, the Federal Awardee Performance and Integrity Information System did "not contain any records or information regarding prior Terminations for Cause or Default, Defective Cost and Pricing Data, Determinations of Non-Responsibility, Terminations for Material Failure to comply (grants) and Recipient Not Qualified Determinations (grants) for J&J." *Id.* Finally, the Navy verified that J&J had "submitted the required [Veterans' Employment and Training Service] 4212 Report." *Id.*

## E. Compliance with the Agreement on Defense Cooperation

The unique arrangement the United States uses to share U.S. Naval Station Rota with the Spanish Navy necessitated additional reviews beyond the requirements of the Revised Solicitation and the Source Selection Plan. *See* Tab 38 at AR 9700-62. Pursuant to the Agreement on Defense Cooperation, a Permanent Committee exists to coordinate shared use of the base. *See id.* at AR 9702. The Permanent Committee "consists of two Sections, Spanish and United States, chaired by representatives of the respective departments of defense." *Id.*

Service contracts at the base fall within the Permanent Committee's purview. *See* Tab 38 at AR 9747. United States' forces are permitted to enter into service contracts and subject contractors to United States "laws and regulations for maintenance or support activities affecting their exclusively used installations or services and parts thereof and for non-permanent utilities and supplies to meet their exclusive needs." *Id.* However, the Agreement required the Navy to "forward a list of potential contractors to the Permanent Committee before awarding the contract,"

as "Spanish authorities may disapprove a contractor for reasons of security or due to the contractor's prior misconduct with the Spanish armed forces."  *Id.*

Initially, the Navy only forwarded the Permanent Committee offers received from Spanish entities.  *Compare* Tab 74 (PC Contract-Award Approval, Naval Station Rota (March 25, 2020)), *with* Tab 75 (PC Contract-Award Approval, Naval Station Rota (May 12, 2020)).  Upon request from the Permanent Committee, however, the Navy requested and submitted J&J's Spanish tax ID (NIF) to the Permanent Committee.  *See* Tab 42 (Email Communications) at AR 9954-56; Tab 83 (Email Transmittal from J&J - Spain NIF Documentation (June 17, 2020)); Tab 85 (Navy Emails with J&J Maintenance - NIF Clarification (June 19, 2020)) at AR 14805-08; Tab 75.  The Spanish Section of the Permanent Committee reviewed J&J's Spanish records and determined that J&J did not raise any security concerns and did not have a prior record of misconduct.  *See* Tab 76 (Memorandum PCM 12962 (June 26, 2020)); Tab 78 at AR 14789 (noting that the Spanish section did not find any issues "as to reasons of security or prior misconduct with the Spanish armed forces").  Nevertheless, the Spanish Section of the Permanent Committee sent a letter to the U.S. Section of the Permanent Committee objecting  to J&J's absence from the *Registro Mercantil*, even though J&J had an NIF.  *See* Tab 82 (Memorandum PCM 12962 (July 1, 2020)); Tab 78 at AR 14789 (noting that the Spanish Section "informed [the American Section] that J&J Maintenance was not found on the '*registro mercantile*'").

The U.S. Section of the Permanent Committee responded to the Spanish Section's complaint with a letter explaining that the Spanish Section's focus on whether J&J is on the *Registro Mercantil* "exceeds the scope of the vetting process and is not a prerequisite for participating in the bidding process or being awarded a U.S. Government services contract."  Tab 78 at AR 14789.  Instead, it explained, the Agreement on Defense Cooperation "makes clear that

the contract bidding and award process is governed by U.S. law, with the sole additional requirement being a vetting for security or misconduct with the Spanish armed forces." *Id*. at AR 14790. It further explained that while a company may be required to take numerous steps "after award to ensure it complies with applicable Spanish law and regulations during contract execution," such "requirements are outside the scope of the pre-award vetting described in Article 2(4)." *Id.* The U.S. Section of the Permanent Committee therefore concluded that the Spanish Section's determination that J&J did not raise any security concerns or have a prior record of misconduct cleared any obstacle the Agreement on Defense Cooperation may present to an award to J&J. *See* Tab 78 at AR 14789. The Navy relied on the U.S. Section's explanation to conclude that further vetting from the Permanent Committee was unnecessary. *See* Tab 79 (Navy Email to the Permanent Committee – PC Contract Award Approval (June 23, 2021)) at AR 14791.

F.  Contract Award

After determining that J&J's offer presented the best value to the Navy, J&J was a responsible bidder, and J&J was not prohibited from award under the Agreement on Defense Cooperation, the Navy issued a business clearance memorandum selecting J&J for award of the Revised Solicitation. *See* Tab 61 at AR 13430-31. On August 31, 2021, the Navy informed Newimar and J&J of the contract award to J&J. Tab 63 (Notice of Contract Award to J&J Worldwide Services (August 31, 2021)) at AR 13446; Tab 64 (Notice to Unsuccessful Offeror - Newimar, S.A. (August 31, 2021)) at AR 14096. Newimar filed this protest less than one month later. *See* Compl. Subsequently, the Navy issued a stop work order to J&J, which has remained in place throughout the pendency of this action. *See* Tab 73 (Stop Work Order (September 28, 2021)) at AR 14784.

<u>APPLICABLE LEGAL STANDARD</u>

This Court reviews post-award bid protests pursuant to the Administrative Procedure Act (APA). 28 U.S.C. § 1491(b)(4); 5 U.S.C. § 706(2)(A); *see Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057 (Fed. Cir. 2000). The APA requires a reviewing court to determine whether an agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law [or] . . . unsupported by substantial evidence." 5 U.S.C. § 706; *see also Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 284 (1974); *Cubic Applications, Inc. v. United States*, 37 Fed. Cl. 339, 342 (1997) ("Although the inquiry [under the APA] is to be searching, it does not permit the court to substitute its judgment for that of the agency." (citing *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416-20 (1971))).

To prevail in a post-award bid protest, a plaintiff must demonstrate that: "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001). When a challenge is brought under the first ground, the court reviews whether "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a 'heavy burden' of showing that the award decision 'had no rational basis.'" *Id.* at 1333 (citations omitted). The court applies a "highly deferential" standard when reviewing challenges to an agency action for lack of a rational basis assuming a "presumption of regularity" by the agency. *Id.* at 1332-33; *Cleveland Assets, LLC v. United States*, 883 F.3d 1378, 1382 (Fed. Cir. 2018); *CHE Consulting, Inc. v. United States*, 552 F.3d 1351, 1354 (Fed. Cir. 2008). When a challenge is brought under the second ground, the court reviews whether there was "a clear and prejudicial violation of applicable statutes or regulations." *Impresa*, 238 F.3d at 1333 (internal quotations omitted).

Where, as here, parties have filed cross motions for judgment on the administrative record, Rule 52.1 of the Rules of the United States Court of Federal Claims (Rules or RCFC) allows the parties to seek an equivalent of an expedited trial on a "paper record, allowing fact-finding by the trial court." *Bannum, Inc. v. United States,* 404 F.3d 1346, 1356 (Fed. Cir. 2005). Courts resolve questions of fact by relying on the administrative record. *Id.* If necessary, a court may remand the case back to a governmental agency under RCFC 52.2 for further factual findings.

A court's analysis of a bid protest proceeds in three steps. First, "the trial court determines whether the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract." *Id.* at 1351. Second, "if the trial court finds that the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct." *Id.* Third, the court determines whether injunctive relief is appropriate based on the plaintiff's success on the merits, irreparable harm to the plaintiff, the balance of hardships to the parties, and the public interest in an injunction. *See Centech Grp., Inc. v. United States,* 554 F.3d 1029, 1037 (Fed. Cir. 2009).

<u>DISCUSSION</u>

Newimar has not met its burden under the APA. The parties' motions raise seven issues: (1) whether the Revised Solicitation and Navy evaluations were "tainted," (2) whether the Navy properly evaluated J&J's responsibility and fitness to perform the contract, (3) whether the Navy improperly evaluated the bidders using undisclosed criteria, (4) whether the Navy performed an adequate best value trade-off analysis, (5) whether the Navy performed a proper price reasonableness evaluation of J&J's proposal, (6) whether the Navy properly evaluated J&J's recurring work versus non-recurring work prices, and (7) whether Newimar is entitled to injunctive relief. *See* Plaintiff's Memorandum in Support of Its MJAR (ECF No. 40-1) (Pl.'s Mem.) at 2;

Defendant's Cross-Motion for Judgment on the Administrative Record and Response to Plaintiff's MJAR (ECF No. 47) (Def.'s Cross-MJAR) at 22-46; Intervenor-Defendant's Cross-Motion for Judgment on the Administrative Record and Response to Plaintiff's MJAR (ECF No. 48) (Int.-Def.'s Cross-MJAR) at 1.[11]   On each issue, Newimar has neither shown that the Navy acted irrationally, violated the terms of the Revised Solicitation, nor acted in violation of U.S. procurement law.   Furthermore, several of Newimar's arguments fail because the alleged errors did not prejudice Newimar.   This Court must therefore deny Plaintiff's MJAR and grant Defendant's and Intervenor-Defendant's Cross-MJARs.

I.   <u>Newimar Waived Its Arguments Regarding Taint in the Revised Solicitation and the Navy's Evaluation, and It Failed to Demonstrate Any Impropriety.</u>

Newimar argues that the Navy's corrective action following Newimar's first protest in this court is tainted by favoritism toward J&J.  *See* Pl.'s Mem. at 8-11.  Specifically, Newimar alleges the Navy removed both (i) Factor 2 (Staffing Approach) from the non-price evaluation factors, and (ii) the requirement to submit pest control licenses at the time of proposal submission, to tilt the procurement in J&J's favor.  *Id.* at 9.  Newimar alleges that the first modification permitted J&J to "rely heavily" on its subcontractor, ████, to meet labor and employment law requirements it was previously unable to meet on its own.  *Id.*  Newimar alleges that the second modification permitted J&J to compete even though it did not have pest control licenses pre-award, when it submitted its proposal.  *Id.*  Defendants respond that (1) Newimar waived its argument by not bringing a pre-award protest, (2) Newimar abandoned its argument by failing to respond to Defendants' counterarguments in Newimar's response and reply brief, and (3) Newimar cannot prevail on the merits as the Navy did not act in bad faith.  Def.'s Cross-MJAR at 35-41; Int.-Def.'s

---

[11] Citations throughout this Memorandum and Order refer to the ECF-assigned page numbers, which do not always correspond to the pagination within the document.

Cross-MJAR at 13-16; Defendant's Reply in Support of Its Cross-MJAR (ECF No. 52) (Def.'s Reply) at 10; Defendant-Intervenor's Reply in Support of Its Cross-MJAR (ECF No. 53) (Int.-Def.'s Reply) at 9-10.   This Court agrees with Defendants; Plaintiff's objections fail both procedurally and substantively.

  A. <u>Newimar's Objections to the Revised Solicitation Are Untimely</u>.

  Defendants argue, and this Court agrees, that Newimar waived its objections to the Revised Solicitation's terms because Newimar failed to raise them before the June 16, 2021 deadline for submitting final revised proposals.  *See* Int.-Def.'s Cross-MJAR at 13-15; Def.'s Reply at 10.  It is settled law that "a party who has the opportunity to object to the terms of a government solicitation . . . and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims." *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007).  The *Blue & Gold* waiver standard ensures that when an agency issues a revised solicitation, bidders do "not have it both ways by ignoring the decision at the time, submitting a revised offer, and then abiding the outcome of the procurement before deciding whether to file a challenge." *Trans Digit. Techs., LLC v. United States*, 138 Fed. Cl. 34, 42 (2018).  Instead, "[t]he deadline for a pre-award challenge to agency action, be it to some term of the solicitation or action by the agency in connection with that solicitation, is the close of bidding, or in this circumstance, the date for final proposal revisions." *Centerline Logistics Corp. v. United States*, 148 Fed. Cl. 332, 336 (2020).

  Here, Newimar and J&J had until June 16, 2021 to submit final proposal revisions.  Tab 52 at AR 11374-11705.  If Newimar believed that the Revised Solicitation's changes from the Original Solicitation were improper, it was required to protest those changes before June 16, 2021. *Blue & Gold Fleet*, 492 F.3d at 1313.  Instead, Newimar submitted its final revised proposal

without noting any objections to the Revised Solicitation's terms.  *See* Tab 56.  Newimar then

waited until filing this post-award protest to complain about (i) removal of Factor 2 (Staffing

Approach) from the Revised Solicitation, and (ii) the Revised Solicitation's amendment of the pest

control license compliance deadline from pre-award to pre-performance.  *See* Tab 63 at AR 13446-

14095; Compl.  Having failed to object to the terms of the Revised Solicitation "prior to the close

of the bidding process," Newimar cannot sustain a protest on such objections now.  *Blue & Gold*

*Fleet*, 492 F.3d at 1313.

       B.     <u>Newimar Abandoned Its Objections to the Revised Solicitation</u>.

       J&J further argues, and this Court again agrees, that even if Newimar had not abandoned

its claims under *Blue & Gold*, it nevertheless did so by failing to address them in its brief submitted

in response to Defendant's and Intervenor-Defendant's Cross-MJARs and in reply in support of

its MJAR.  *See* Int.-Def.'s Reply at 1-2; *see generally* Plaintiff's Response to Defendant's and

Intervenor-Defendant's Cross-MJARs and Reply In Support of Plaintiff's MJAR (Pl.'s Reply)

(ECF No. 49).  A party is not permitted "to raise a phalanx of thin arguments in a dispositive

motion — thereby forcing the opposing party to spend time and briefing space to engage with all

of them — only to abandon them in the face of the counterarguments, and yet insist that the Court

adjudicate the entire initial salvo."  *Golden IT, LLC v. United States*, No. 21-1966C, 2022 WL

334369, at *12 (Fed. Cl. Feb. 4, 2022); *see Cap Export, LLC v. Zinus, Inc.*, 722 F. App'x 1004,

1009 (Fed. Cir. 2018) (suggesting that appellant "may have abandoned the reference altogether, as

[it] did not address that reference in its opposition brief before the district court"); *see also Voith*

*Hydro, Inc. v. United States*, 143 Fed. Cl. 201, 218 (2019) (holding that plaintiff's failure to reply

to defendant's response to an argument in plaintiff's opening brief "evince[ed] an abandonment of

this protest ground").

Defendant and Intervenor-Defendant devote a considerable amount of their Cross-MJARs responding to Newimar's arguments concerning "taint" in the Revised Solicitation. Def.'s Cross-MJAR at 35-41; Int.-Def.'s Cross-MJAR at 13-16. In its response and reply brief, Newimar neither addresses Defendants' *Blue & Gold* waiver argument nor Defendants' arguments on the merits. *See generally* Pl.'s Reply. Indeed, Newimar's response and reply entirely omits any mention of "taint" in the Revised Solicitation. *Id.* Accordingly, Newimar abandoned its arguments regarding tainted amendments in the Revised Solicitation.

C.   Even Ignoring the Procedural Shortcomings in Newimar's Allegation of "Tainted" Solicitation Revisions, Newimar Cannot Prevail Because the Navy Did Not Act in Bad Faith.

Newimar argues that the Navy's corrective action entailed a "careful plan to make specific modifications to the RFP requirements, with the primary purpose being to ensure that an award could be made to J&J." Pl.'s Mem. at 8-9. As Defendants properly note, Newimar's allegation amounts to a claim of bad faith. Def.'s Cross-MJAR at 34-36; *see also* Int.-Def.'s Cross-MJAR at 16. There is a "strong presumption that government officials . . . carry out their duties lawfully and in good faith." *Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1238 (Fed. Cir. 2002). To overcome the presumption, a protester must present clear and convincing evidence, or what some courts characterize as "well-nigh irrefragable proof" of improper conduct. *Id.* at 1239-40 (quoting *Schaefer v. United States*, 633 F.2d 945, 949 (Ct. Cl. 1980)). Such evidence must be based on "hard facts" rather than mere "suspicion and innuendo." *C.A.C.I., Inc.-Fed. v. United States*, 719 F.2d 1567, 1582 (Fed. Cir. 1983). Newimar does not meet that high bar.

The allegedly suspicious facts Newimar cites as illustrating bad-faith procurement amount to mere innuendo. Newimar alleges that the Navy's removal of Factor 2 (Staffing Approach) from the Revised Solicitation, which "allowed J&J to rely heavily on ████████, a seasoned janitorial subcontractor, but not one with significant U.S. Government contract experience on active bases

34

comparable to the size of the NAVSTA Rota," purportedly demonstrates bias toward J&J. Pl.'s Mem. at 8-9. However, that innuendo completely ignores that Newimar and J&J were equally deficient on Factor 2 during their evaluation under the Original Solicitation. *See* Tab 45 at AR 10521 (rating J&J's Factor 2 "Unacceptable"), 10529 (rating Newimar's Factor 2 "Unacceptable"); Tab 47 at AR 10607 (recommending removing Factor 2 because "both J&J and Newimar's deficiencies under this Factor could be easily corrected without presenting a risk of unsuccessful performance going forward") (bolding omitted). Newimar therefore stood to gain just as much from the removal of Factor 2. Indeed, that is precisely what occurred during the evaluation following corrective action. *Compare* Tab 47 at AR 10600 (awarding Newimar and J&J "Unacceptable" ratings for the Overall Technical Rating), *with* Tab 58 at AR 13224 (indicating an Overall Technical Rating of "Outstanding" for both Newimar and J&J following the removal of Factor 2). An amendment that equally benefitted both offerors cannot sustain an allegation of bad faith.

Nor can any of the other unconnected allegations Newimar highlights in its MJAR sustain such a bad faith claim. Newimar contends that the "Revised Solicitation also ensured that J&J could transfer to [a subcontractor] other requirements for complying with Spanish labor and employment laws, and in turn avoid taking these responsibilities on itself." Pl.'s Mem. at 9. However, Newimar does not cite any Spanish law to explain this allegation, nor does it cite any evidence indicating the Navy made revisions to subvert Spanish law. *See id.* Next, Newimar notes that the Navy amendment of the deadline for pest control license acquisition from the pre-award proposal submission date to the post-award contract performance date "removed another reason why J&J was ineligible to be awarded the first Contract"; however, Newimar fails to cite any evidence suggesting even an inkling of the Navy's supposed malign intentions in making such

revision.  *Id*. at 8-9.  Finally, Newimar suggests that the Navy used unstated evaluation criteria "intended to essentially make this a sole-source award to J&J."  *Id.* at 11.  As explained below, however, the Navy did not evaluate the proposals with unstated criteria.  None of Newimar's allegations, alone or in combination, illustrate bad faith.

While on first glance, a suspicion could potentially have arisen that the revisions to the Original Solicitation were made to favor J&J given J&J's bid received a more favorable assessment under the Revised Solicitation, such suspicion is unsupported.  Upon review of the Administrative Record and applicable law, it is evident that on the record before this Court Newimar has not, and cannot, overcome the presumption that the Navy carried out its corrective action in good faith.  *See Am-Pro Protective Agency*, 281 F.3d at 1239.  The Navy's stated rationale for undertaking corrective action was "affording Newimar a fair opportunity to compete as if its proposal had not been eliminated from the competition, and by undertaking other corrective action in accordance with the Solicitation, the FAR, and all other applicable Federal law."  *Newimar v. United States*, Case No. 20-cv-01724, Defendant's Motion to Dismiss (ECF No. 40) at 2 (referencing ECF No. 40-1 at 2 (Declaration of Matthew R. Lewis)).  As Newimar does not present "clear and convincing" evidence to the contrary, and the Administrative Record does not contain any such contrary evidence, this Court must reject Newimar's complaints that the Revised Solicitation was tainted with bias toward J&J.  *Am-Pro Protective Agency*, 281 F.3d at 1239-40.

II.    The Navy's Responsibility and Fitness Determination Was Not Arbitrary, Capricious, or Contrary to Law.

Newimar offers a litany of reasons why it believes J&J was unfit for an award under both the Original and Revised Solicitations.  *See generally* Pl.'s Mem. at 11-13; Pl.'s Reply at 8-17.  Specifically, Newimar contends that J&J cannot be a responsible offeror because: (1) J&J does not have a Spanish "N" tax number, Pl.'s Mem. at 11; (2) J&J and its subcontractor, ██████, lack

required pest control licenses, *id.*; (3) J&J's use of a subcontractor violates Spanish labor laws regarding subrogation of the existing workforce, *id.* at 9; Pl.'s Reply at 15-16; (4) J&J did not have a "W" tax number by the award date, Pl.'s Reply at 14-15; (5) J&J does not comply with Spanish law requiring registration in the *Registro Mercantil*, *id.* at 8; and (6) the Spanish Section of the Permanent Committee overseeing the Agreement on Defense Cooperation (ADC) did not approve the award to J&J, *id.* at 8-9.  However, Newimar waived the latter three arguments (alleged "W" tax number issue; *Registro Mercantil* registration issue, and ADC compliance issue) because it did not raise them until its reply brief.[12]  "Raising the issue for the first time in a reply brief does not suffice; reply briefs *reply* to arguments made in the response brief — they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration." *Novosteel SA v. U.S., Bethlehem Steel Corp.*, 284 F.3d 1261, 1274 (Fed. Cir. 2002).[13]

---

[12]  Newimar submitted one memorandum containing its reply in support of its MJAR and its response to Defendant's and Intervenor-Defendant's Cross-MJARs.  (ECF No. 49.)  However, rather than respond to arguments in Defendants' Cross-MJARs, Newimar advanced untimely, new arguments in support of Newimar's MJAR.

[13]  At oral argument, Plaintiff asserted that U.S. Court of Federal Claims cases establish "that arguments raised for the first time in a reply brief are not waived if opposing party had a chance to address them, or if they have been alluded to in prior filings." Tr. Oral Arg. at 11:24-12:5.  The cases to which Newimar cited during oral argument are inapposite to the facts in this action.  As an initial matter, "this Court is not bound by the decisions of other judges on the Court of Federal Claims." *Almanza v. United States*, 136 Fed. Cl. 290, 296 (2018).  One of the cases to which Newimar cites confirms the *Novosteel* rule, and only goes on to consider the plaintiff's arguments raised for the first time in the reply "for the exclusive purpose of providing an alternative holding." *Qwest Gov't Servs., Inc. v. United States*, 112 Fed. Cl. 24, 36-37 (2013).  Two other cases at most reflect that this Court may exercise discretion to consider arguments raised for the first time in a reply brief.  *See Am. Corr. Healthcare, Inc. v. United States*, 137 Fed. Cl. 395, 420-21 (2018); *Ironclad/EEI v. United States*, 78 Fed. Cl. 351, 358 (2007).  Further, nothing in those cases reflects that judges cannot exercise their discretion to disregard arguments initially raised in reply, as this Court opts here.  In fact, the Federal Circuit recently held that the Court of Federal Claims did not abuse its discretion in refusing to address an argument raised for the first time in a reply brief. *Kelly-Leppert v. United States*, No. 2202-1301, slip op. at 3 (Fed. Cir. May 9, 2022).  In addressing the merits of Newimar's waived arguments in this Memorandum and Order, this Court merely adopts The Honorable Margaret Sweeney's cautious and well-reasoned approach in *Qwest* to provide "an alternative holding." *Qwest Gov't Servs.*, 112 Fed. Cl. at 37.

Notwithstanding this waiver, the Court must still reject each of Newimar's arguments as factually incorrect, beyond this Court's jurisdiction, legally unsupportable, or as mooted by the Navy's corrective action leading to the Revised Solicitation.

A.   Contrary to Newimar's Argument, J&J Has an "N" Tax Number.

Newimar first alleges that the Navy erred in finding J&J a responsible bidder when "J&J has not incorporated a Spanish branch and has no tax number (an "N" number) to conduct business in Spain." [14]  Pl.'s Mem. at 11.  However, the Administrative Record indicates that J&J had an "N" number as of June 16, 2020.  *See* Tab 42 at AR 9978-9.1 (indicating the formal certificate of NIF for J&J Maintenance, Inc. issued on "16-06-2020"); *see also* Tab 83(providing documentation of NIF for J&J Maintenance, Inc. to the Navy).  Newimar concedes this point in its reply.  Pl.'s Reply at 14.  Accordingly, the Court must reject the first of Newimar's three non-waived arguments regarding J&J's eligibility for award as a responsible offeror.

B.   Pest Control Licenses, *Registro Mercantil* Registration, Spanish Tax Numbers, and Spanish Labor Law Are Issues of Contract Administration Beyond This Court's Protest Jurisdiction.

Having conceded that the "N" tax number cannot sustain its protest, Newimar pivots to argue that J&J should "have a Permanent Establishment in Spain and its Tax Identification Number prefix should be 'W' rather than 'N.'"  Pl.'s Reply at 14.  Even if Newimar had not waived this untimely argument, as noted above, this Court must nevertheless reject Newimar's argument as a contract administration matter beyond this Court's bid protest jurisdiction.  For the same reason, this Court must also reject Newimar's arguments regarding (i) J&J's registration in the *Registro Mercantil* — which Newimar also waived — (ii) pest control licensure, and (iii) compliance with Spanish labor laws.

---

[14] The "N" number Newimar references is more commonly known as an "NIF."

Contrary to Newimar's arguments, none of these issues relate to contractor responsibility. Responsibility determinations relate "to an offeror's apparent ability and capacity to perform all contract requirements and [are made], not at proposal opening, but at any time prior to award of the contract based on any information received by the agency up to that time." *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1034 n.2 (Fed. Cir. 2009) (citing 48 C.F.R. § 9.105–1 (2008)). Requirements that "are not required to be satisfied by the contractor until after the contract is awarded" are therefore not considered responsibility requirements. *Advanced Am. Constr., Inc. v. United States*, 111 Fed. Cl. 205, 223 (2013).   Such requirements are "matters of post-award contract administration" over which this Court lacks jurisdiction. *Id.* at 224; *Cont'l Serv. Grp., Inc. v. United States*, 722 F. App'x 986, 992 (Fed. Cir. 2018) (citing 41 U.S.C. § 7103).

The Revised Solicitation requires bidders to obtain "all required permits, licenses, and authorizations to perform work under this contract."  Tab 16 at AR 5181; Tab 50; Tab 54.  The offerors must submit proof of pest control licenses "*[p]rior to the start of performance*," Tab 50 at AR 10746 (emphasis added), and proof of other required permits and licenses "[w]ithin 15 calendar days *after* award." *Id.* at AR 10734 (emphasis added).  As J&J is not required to submit its pest control license until post-contract award, pest control licensure "cannot be viewed as [a] responsibility requirement[]." *Advanced Am. Constr.*, 111 Fed. Cl. at 223.

J&J's tax and *Registro Mercantil* registrations likewise only require submission after award as they are permits, licenses, or authorizations to work.  *See* Pl.'s Mem. at 11 (arguing that a lack of an "N" tax number violated the requirement for offerors "to be registered to conduct business in Spain"); Pl.'s Reply at 14 (discussing an implied "obligation to be registered in the Spanish Registro Mercantile" to perform in work in Spain).  Thus, even if Newimar were correct that J&J currently does not comply with these post-award, pre-performance requirements, it is of no

moment in this action; simply put, it does not concern J&J's responsibility and eligibility for the award.

The Navy also specified in the Revised Solicitation that Spanish labor law was a matter of contract administration, not a requirement for award eligibility.  In response to offeror inquiries about subrogation of labor and labor agreements under Spanish law, the Navy explained that "[t]he *awardee* will be responsible for complying with Spanish law as stated throughout the solicitation." Tab 16 at AR 5516 (emphasis added).  It also explained that "[a]dditional information from the current contractor," which a successful offeror would need for subrogation of the incumbent's workers, "will be provided *only* to the successful offeror *after contract award*."  *Id.* (emphases added).  As compliance with labor requirements would only occur after contract award, it is not a matter of responsibility and eligibility for the award.  *See Cont'l Serv. Grp*, 722 F. App'x at 992.

Newimar argues that this Court should nevertheless hold that the Navy erred by finding J&J responsible and eligible for the award on account of the length of time it would require for J&J to obtain the requisite licenses and registration.  Pl.'s Reply at 17.  For example, Newimar argues that it is not possible for J&J to comply with the licensure and registration requirements because "it may take up to 6 months for ROESB and 40 days for ROPO to act and issue licenses." *Id.*  Newimar does not cite any evidence for this assertion, making it entirely speculative.  *See id.* This Court will not deviate from the general rule, that matters of post-award contract administration fall outside of its bid protest jurisdiction, based on Newimar's mere conjecture. *Cont'l Serv. Grp*, 722 F. App'x at 992.  To the extent J&J lacked pest control licenses, registration in the *Registrio Mercantil*, or a Spanish tax identification number at the time of the award, the Navy did not violate the terms of the Revised Solicitation or U.S. law in concluding that J&J was nevertheless a responsible offeror.

C.     Even if J&J's Compliance with Spanish Labor Law Fell Within This Court's Jurisdiction, Newimar Has Not Identified a Labor Law Violation That Would Render J&J Irresponsible.

While Newimar argues in its MJAR that J&J's use of a subcontractor to perform the contract "does not comply with Spanish law regarding subrogration [sic] of the existing workforce," it fails to cite any law prohibiting such an arrangement.  Pl.'s Mem. at 9.  Newimar's reply brief does not add much clarity, as it generically references "existing collective bargaining agreements, Article 44 of the Workers' Statute Law, and the applicable case law that interprets and applies the Statute."  Pl.'s Reply at 16.  While the Kingdom of Spain has a proud history of launching expeditions to map uncharted territory, this Court does not.  *See Acrow Corp. of Am. v. United States*, 97 Fed. Cl. 182, 187 (2011) ("A premium on advocacy exists, and the court does not act as an investigative magistrate."); *see also Frontline Healthcare Workers Safety Found., Ltd. v. United States*, No. 10-17C, 2010 WL 637790, at *1 n.1 (Fed. Cl. Feb. 4, 2010) (ignoring plaintiff's argument about agency delay in awarding a contract where the plaintiff "has not directed the Court to any relevant authority regarding agency delay or articulated  a clear legal theory that might give effect to its allegations").  Accordingly, even if the argument were not waived, it would still fail as this Court lacks a cogent legal theory by Plaintiff to review.

D.     Newimar's Objections Based on the Original Solicitation Are Moot, and Newimar Waived Any Challenge to the Revised Solicitation's Terms.

Newimar alternatively argues that even if J&J's lack of pest control licenses, *Registro Mercantil* registration, and a Spanish tax identification number did not violate the Revised Solicitation, such failures violate the Original Solicitation.  *See* Pl.'s Mem. at 11.  Newimar then extrapolates that if J&J were ineligible under the Original Solicitation, it would necessarily be ineligible for future award.  *See id*.  Specifically, it contends that "nothing in the Revised Solicitation allows a company that was not qualified to win the award initially, and that had its

improperly-awarded contract terminated, to continue to participate in the same procurement or to receive a contract award if its status in Spain was not changed."  Pl.'s Mem. at 12.  However, the Revised Solicitation did not require any specific language permitting J&J to recompete for the award, as the Navy's corrective action mooted any issues with the Original Solicitation and any award based on that solicitation.

An issue is moot when "during the course of litigation, it develops that the relief sought has been granted or that the questions originally in controversy between the parties are no longer at issue."  *Chapman L. Firm Co. v. Greenleaf Const. Co.*, 490 F.3d 934, 939 (Fed. Cir. 2007).  Corrective action typically renders "moot those errors alleged in an initial decision."  *Nat'l Air Cargo Grp., Inc. v. United States*, 127 Fed. Cl. 707, 717 (2016).  Plaintiff argued in its first bid protest before the U.S. Court of Federal Claims, as it similarly does here, that "J&J did not (and cannot) submit one specific license required by the Solicitation to be submitted prior to award." *Newimar v. United States*, Case No. 20-cv-01724, Plaintiff's Memorandum in Support of Motion for Judgment on the Administrative Record (ECF No. 37) at 33.  The Navy remediated that issue by (i) revoking the initial award to J&J, (ii) issuing Amendment 0008, which changed the deadline for submitting licenses from pre-award to "[p]rior to the start of performance," and (iii) reopening bidding under the Revised Solicitation.  *Compare* Tab 13 at AR 3777 (requiring contract to submit license prior to award), *with* Tab 50 at AR 10746 (requiring contractor to submit license prior to start of contract performance); *see also Newimar, S.A. v. United States*, 152 Fed. Cl. 521, 523 (2021).  This removed any issues J&J may have borne after the initial award.  Accordingly, Newimar's "claims underlying the original protest are moot because the contract award has been set aside."  *Newimar*, 152 Fed. Cl. at 524.

To the extent Newimar objects to the Navy's choice to alter the licensing requirements in the Revised Solicitation, such a protest is untimely.  *See Blue & Gold Fleet*, 492 F.3d at 1313; *Centerline Logistics Corp.*, 148 Fed. Cl. at 336 (explaining that the deadline for challenging a term of the solicitation or an agency action connected to the solicitation "is the close of bidding, or in this circumstance, the date for final proposal revisions").  Newimar did not challenge the Navy's revision to the Revised Solicitation either with the Navy, or by filing a claim at the GAO or at the U.S. Court of Federal Claims.  Tab 56; *see also Harmonia Holdings Grp., LLC v. United States*, 20 F.4th 759, 768 (Fed. Cir. 2021) (explaining that filing a challenge with the agency pre-award preserves the protestor's right to protest solicitation terms post-award).  Therefore, it may not complain such revisions now or avoid waiver by arguing that this Court should evaluate the Navy's responsibility determination based on the Original Solicitation.

    E.    <u>This Court Lacks Jurisdiction Over Disputes Related to the Agreement on Defense Cooperation</u>.

Newimar also argued for the first time in its reply that J&J was ineligible for award under the Agreement on Defense Cooperation between the United States and the Kingdom of Spain of December 1, 1988 (ADC).[15]  Pl.'s Reply at 8-14.  That Agreement requires the U.S. Government to "forward a list of potential contractors to the Permanent Committee" — which comprises representatives from the Spanish and U.S. governments, *see* ADC, Ch. I, Article 7 — "before award of a service contract" at Naval Station Rota.  *See* ADC, Annex 6, Article 2, ¶ 4.  The Agreement also states that "contracts for support or maintenance of the installations jointly used and for the general services of the case" and service contracts "for maintenance or support activities affecting [the United States'] exclusively used installations or services and parts thereof

---

[15]  The Agreement is available in full at https://es.usembassy.gov/agreement-on-defense-cooperation/ (last visited May 11, 2022).

and for non-permanent utilities and supplies to meet their exclusive needs," among others, "shall be entered into with companies authorized to carry out these activities in Spain under Spanish law."  ADC, Annex 6, Article 2, ¶¶ 1, 4, 7.  Although, as explained above, Newimar waived this untimely argument by initially raising it in its reply, it is beyond this Court's jurisdiction to delve into whether J&J satisfied any requirements of such an international agreement.

This Court's jurisdiction generally excludes "any claim against the United States growing out of or dependent upon any treaty entered into with foreign nations."  28 U.S.C. § 1502.  The inquiry "is whether plaintiff's claim could conceivably exist independently of, or separate and apart from, the subject treaty, or whether, on the contrary, it derives its existence so exclusively and substantially from certain express terms or provisions thereof, that consideration of the claim would necessitate our construction of the treaty itself."  *Hughes Aircraft Co. v. United States*, 534 F.2d 889, 903 (Ct. Cl. 1976).  Newimar's arguments regarding compliance with the Agreement on Defense Cooperation depend on interpretation of a specific provision of that Agreement rather than anything in the Revised Solicitation.  *See* Pl.'s Reply at 8-14.  The Agreement on Defense Cooperation is an executive agreement that operates "in the framework of the North Atlantic Treaty" to which the United States and Spain are signatories.  ADC, Chapter 1, Article I, ¶ 1.  Newimar's claim hinges on an allegation that the Spanish Section did not approve J&J as an offeror according to the Agreement of Defense Cooperation.  Thus, this argument "derives its life and existence" from the Agreement.  *Hughes Aircraft Co.*, 534 F.2d at 904.  Accordingly, this Court lacks jurisdiction to consider Newimar's argument.  *See* 28 U.S.C. § 1502.

III.   The Navy Did Not Evaluate the Offers Using Undisclosed Criteria.

Plaintiff next asserts that the Navy evaluated the proposals based on undisclosed criteria when it: "(1) gave extra weight to J&J for working on more projects than NEWIMAR in its evaluation of Factors 1 and 4; (2) gave extra weight to J&J for allegedly 'self-performing' a larger

percentage of work than NEWIMAR on past projects; and (3) denigrated the value of NEWIMAR being the incumbent maintenance service contractor." Pl.'s Mem. at 13. Defendants contend that the Navy did not rely on undisclosed criteria and that the Solicitation's language allowed the Navy to consider the number of relevant projects submitted and the percent of projects "self-performed." Def.'s Cross-MJAR at 42-46; Int.-Def.'s Cross-MJAR at 23-27. J&J further argues that even if the Navy did use undisclosed criteria that it did not prejudice Newimar. Int.-Def.'s Cross-MJAR at 27-29. This Court agrees with the Defendants on both the merits and concerning lack of prejudice.

"It is hornbook law that agencies must evaluate proposals and make awards based on the criteria stated in the solicitation" and "may not rely upon undisclosed evaluation criteria in evaluating proposals." *Banknote Corp. of Am. v. United States*, 56 Fed. Cl. 377, 386 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004). FAR 15.305(a) underscores that "an agency shall evaluate competitive proposals and then assess their relative qualities *solely* on the factors and subfactors specified in the solicitation." FAR 15.305(a) (emphasis added). This ensures that offerors are "on notice" of how they will be evaluated providing them with an equal opportunity to fairly compete for the contract. *See Lab'y Corp. of Am. Holdings v. United States*, 116 Fed. Cl. 643, 652 (2014).

However, "a solicitation need not identify each element to be considered by the agency during the course of the evaluation where such element is intrinsic to the stated factors." *Banknote Corp. of Am.*, 56 Fed. Cl. at 387 (quoting *Analytical & Rsch. Tech., Inc. v. United States,* 39 Fed. Cl. 34, 45 (1997)). Agencies have "great discretion in determining the scope of an evaluation factor." *Maint. Eng'rs v. United States*, 50 Fed. Cl. 399, 415 (2001) (quoting *Forestry Survs. and Data v. United States*, 44 Fed. Cl. 493, 499 (1999)). Accordingly, "to prevail on an argument that the agency impermissibly employed an unstated evaluation criterion, a protester must show, at a

45

minimum, that the agency 'used a significantly different basis in evaluating the proposals than was disclosed.'" *Harmonia Holdings Grp., LLC v. United States*, 153 Fed. Cl. 245, 255 (2021) (quoting *Wellpoint Mil. Care Corp. v. United States*, 144 Fed. Cl. 392, 404 (2019), *aff'd*, 953 F.3d 1373 (Fed. Cir. 2020)).  The protester must then show that it "was prejudiced as a result — that it had a substantial chance to receive the contract award but for that error." *Banknote Corp. of Am.*, 56 Fed. Cl. at 386-87.  Plaintiff fails both requirements of this two-prong test.

A. The Navy Reasonably Credited J&J for Working on More Projects Than Newimar Based on the Revised Solicitation's Statement That the Navy Would Evaluate the "Breadth" of the Offerors' Experience.

Newimar first asserts that it was improper for the SSA to determine "that J&J held a 'slight advantage' on Factor 1," based on J&J having four relevant projects as compared to two for Newimar, since the Revised Solicitation did not disclose "that the performance of *more projects* would be weighted *more favorably* in consideration of" Factors 1 (Corporate Experience) and 4 (Past Performance).  Pl.'s Mem. at 13-14 (emphases in original).  Newimar failed to address this argument with respect to Factor 4 in its response and reply brief, only maintaining this argument with respect to Factor 1.  *See* Pl.'s Reply at 18-22.  Accordingly, Newimar has abandoned this argument with respect to Factor 4.  *See Golden IT, LLC v. United States*, 157 Fed. Cl. 680, 695 (2022) (holding argument abandoned where raised in the motion for judgment on the administrative record, responded to by opposing party in its opposition, but omitted from movant's reply brief).  Concerning Factor 1, as explained below, the Navy reasonably exercised its discretion to interpret the Revised Solicitation's "depth and breadth" language as allowing comparisons of the number of projects submitted by the offerors.

Under the Revised Solicitation, offerors were required to submit a minimum of two and maximum of five recent and relevant projects for consideration under Factor 1.  Tab 50 at AR 10727-29.  The Revised Solicitation further disclosed that "[b]eyond the minimum standards," the

46

Navy would evaluate the "depth and breadth" of the offerors' relevant experience.  *Id.* at AR 10732.  The Navy applied this stated criterion when it determined that "J&J's corporate experience shows a greater breadth of experience over Newimar with four (4) relevant projects compared to the two (2) relevant projects offered by Newimar."  Tab 58 at AR 13227.

The Navy reasonably exercised its discretion in applying the "breadth" factor, as the number of projects performed by an offeror is not a "significantly different basis in evaluating the proposals than was disclosed."  *Wellpoint Mil. Care Corp.*, 144 Fed. Cl. at 404.  Among other considerations, "breadth," means "[l]argeness of scope, extent, or reach; the quality of encompassing, including, or affecting a great number of people or things; comprehensiveness." *Breadth*, OXFORD ENGLISH DICTIONARY ONLINE, https://www.oed.com/view/Entry/22905?redire ctedFrom=breadth#eid (last visited May 11, 2022).  In other words, breadth connotes numerosity. The Navy considered just that when it gave J&J's proposal a slight advantage for demonstrating more experience based on a greater number of past performance projects.  *See* Tab 58 at AR 13227. The Navy's decision to cap project submissions at five does not limit its "great discretion in determining the scope of an evaluation factor."  *Maint. Eng'rs*, 50 Fed. Cl. at 415 (quoting *Forestry Survs. and Data*, 44 Fed. Cl. at 499).  While that limitation might have cabined how much weight the Navy could assign to "breadth" if the offerors had both submitted the maximum, or near the maximum, number of relevant past projects, here the Navy reasonably concluded that J&J having twice as many projects as Newimar was a "slight advantage" in favor of J&J.  Tab 59 at AR 13234. The Court's role is not to second-guess that exercise of discretion, and it declines to do so here. *See Impresa*, 238 F.3d at 1333 (finding an agency need only establish a "reasonable explanation of its exercise of discretion" (citing *Latecoere Int'l, Inc. v. United States Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994))).

47

B. <u>The Navy Reasonably Credited J&J for Self-Performing a Greater Percentage of Past Projects Based on the Revised Solicitation's Terms</u>.

Plaintiff next asserts that the Navy improperly evaluated proposals based on the percentage of self-performed work, which was not disclosed in the Revised Solicitation.  Pl.'s Mem. at 13-14.  This Court disagrees.  The Revised Solicitation's requirements — explicitly and by implication — put offerors "on notice" that the Navy would consider whether projects were self-performed. *Lab'y Corp. of Am. Holdings*, 116 Fed. Cl. at 652.

The Revised Solicitation expressly states that "[p]rojects performed by the Offeror may be considered more favorably than those performed by a proposed subcontractor or by affiliates/subsidiaries/parent/LLC/LTD member companies."  Tab 50 at AR 10732.  Furthermore, "it is evident, when looking at the solicitation as a whole, that [percentage of self-performed work] is a subfactor of the solicitation."  *Bean Stuyvesant, L.L.C. v. United States*, 48 Fed. Cl. 303, 321 (2000).  The Revised Solicitation stated that the Navy would evaluate Factor 1 based on the information that offerors provided in the J-2 Forms, which in turn required offerors to identify their role in each project as "Prime Contractor," "Sub Contractor," "Joint Venture Member," or "Other."  Tab 50 at AR 10727-28, 10732; Tab 8 at AR 443.  Each offeror was also required to provide the "[p]ercent of project work performed by" the offeror itself.  Tab 8 at AR 443.  Given these clear instructions and admonitions, Newimar cannot and should not be surprised after the Navy followed through with its warning that self-performed projects "may be considered more favorably than those performed by a proposed subcontractor."  Tab 50 at AR 10732.

The Navy's evaluation of whether past projects were self-performed was also a reasonable exercise of discretion in applying the "depth and breadth" factors described in the Revised Solicitation.  Tab 50 at AR 10732.  As a quality, "depth" refers to something "of considerable extension or distance downwards, or inwards."  *Depth*, OXFORD ENGLISH DICTIONARY ONLINE,

https://www.oed.com/view/Entry/50487?redirectedFrom=depth#eid (last visited May 11, 2022).

Referencing a person's actions, it refers to "[p]rofundity, penetration, sagacity." *Id.* Given such

definitions that connote quality of experience, this Court cannot say that the Navy's evaluation of

whether projects were self-performed — and therefore required more knowledge and skills to

execute than when subcontracted to another party — involved using a "significantly different basis

in evaluating the proposals than was disclosed." *Wellpoint Mil. Care Corp.*, 144 Fed. Cl. at 404.

Again, this Court declines to second-guess the Navy's reasonable discretion to apply the Revised

Solicitation's evaluation terms. *See Impresa*, 238 F.3d at 1333.

     C.  <u>The Navy Reasonably Exercised Its Discretion in Weighing the Value of Newimar's Incumbency</u>.

Plaintiff finally asserts that the Navy "denigrated" Newimar's incumbent status by failing

to adequately credit Newimar's experience as NAVSTA Rota's maintenance service contractor

for over 25 years. Pl.'s Mem. at 13-15. According to Newimar, the SSA's conclusion "that

'Newimar's history of performing at N[aval] S[tation] Rota did not add any more value for the

Government than J&J's demonstrated capability of performing on projects with essentially the

same scope of services at locations around the world'" improperly discounted Newimar's

"superior knowledge of Spanish law and local practices" and its experience working with

government personnel and establishing a "Work Reception Center." Pl.'s Mem. at 14-15 (quoting

Tab 59 at AR 13233-34). Newimar does not cite any provision of the Revised Solicitation, law,

or regulation that requires the Navy to treat incumbent work more favorably. *See generally*, Pl.'s

Mem. at 14-15; Pl.'s Reply at 20-22. Instead, it argues that the Solicitation's "depth and breadth"

language led it to believe that its "incumbency" would merit "*some* advantage" over J&J in the

evaluation process. Pl.'s Reply at 20-22 (emphasis in original). While the Navy "certainly *may*

weigh the competitive advantages offered by that incumbent," it may equally elect not to weigh

those advantages.[16]  *Gulf Grp., Inc. v. United States*, 56 Fed. Cl. 391, 398 (2003).

However, the Administrative Record shows that the Navy did weigh those advantages and concluded that Newimar's incumbency was equal to the value of J&J's experience in "performing on projects with essentially the same scope of services at locations around the world."  Tab 59 at AR 13233-34.  In best value procurements like this one, the Navy has substantial discretion in its technical evaluations.  *See E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996) (holding that agencies have "substantial discretion to determine which proposal represents the best value for the government").  Newimar does not point to anything so unique about Naval Station Rota that would render the Navy's conclusion here unreasonable.  Accordingly, this Court must, and does, defer to that conclusion.  *See Widnall v. B3H,* 75 F.3d 1577, 1580 (Fed. Cir. 1996) (holding that Board of Contract Appeals should defer to the agency's procurement decision if it is "grounded in reason").  While Newimar may disagree with the Navy's conclusion, the conclusion does not amount to "denigration" that can support a protest here.

D.  <u>Newimar Has Not Established That Any Alleged Reliance on Unstated Criteria Prejudiced Newimar</u>.

Even if Newimar could show that the Navy arbitrarily and capriciously applied unstated evaluation criteria — which it cannot — Newimar's claim still fails for a lack of prejudice.  Given "there is no presumption of prejudice when a protestor demonstrates irrationality in an agency decision," Newimar must establish prejudice for this Court to sustain its protest.  *Sys. Stud. & Simulation, Inc. v. United States*, 22 F.4th 994, 998 (Fed. Cir. 2021).  To establish prejudice,

---

[16] Plaintiff's reference to *Gulf Grp., Inc. v. United States*, 56 Fed. Cl. 391 (1998), in its reply brief does not alter the Court's analysis.  Pl. Reply at 22.  In *Gulf Group*, the court held that an agency in a best value procurement "*may* weigh the competitive advantages offered by that incumbent." *Gulf Grp.*, 56 Fed. Cl. at 398 (emphasis added).  The court's permissive language undercuts Plaintiff's argument, as it appropriately reflects the broad discretion given to agencies in weighing incumbency in best value procurements.

Newimar must show that "it had a substantial chance to receive the contract award but for that error." *Banknote Corp. of Am.*, 56 Fed. Cl. at 387. Put another way, Newimar must demonstrate "that it was within the zone of active consideration." *Allied Tech. Grp., Inc. v. United States*, 649 F.3d 1320, 1326 (Fed. Cir. 2011) (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed. Cir. 1996)). This burden may be met by demonstrating that the protestor would have changed its proposal knowing how the agency would conduct the procurement, or by demonstrating that the protestor would have had a substantial chance of receiving the contract award if the objectionable factors "were removed from consideration." *Acad. Facilities Mgmt. v. United States*, 87 Fed. Cl. 441, 471 (2009); *see Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1563 (Fed. Cir. 1996) (explaining that prejudice was absent when "the protestor had not 'demonstrated that it could have improved its proposal in any material way so as to raise its score or increase its advantage'" (quoting *Caelum Rsch. Corp. v. Dep't of Transp.*, 95–2 B.C.A. (CCH) at 138, 263)). Newimar fails to meet its burden here.

Newimar does not make any showing of prejudice in its MJAR with respect to the Navy's use of unstated evaluation criteria. *See* Pl.'s Mem. at 13-16. J&J responds that even if the findings Newimar challenges "were the product of unstated evaluation criteria, absent those findings the record reflects that the Agency still would have considered J&J at least somewhat superior to NEWIMAR on Factors 1 and 4 based on the unchallenged findings alone." Int.-Def.'s Cross-MJAR at 28. Newimar does not rebut J&J's argument in its response and reply. *See* Pl.'s Reply at 18-22.

Instead, Newimar argues that it was prejudiced because it would have challenged the terms of the Revised Solicitation and structured its proposal differently had it known how the Navy would apply the solicitation's "depth and breadth" provision. *See* Pl.'s Reply at 19 ("Had

NEWIMAR anticipated that the undisclosed 'numerosity of projects' criterion would be evaluated as part of Factor 1, and that it would carry as much import as it did, NEWIMAR would have challenged both the Original Solicitation . . . or the Revised Solicitation when it was received."), 20 ("Similarly, a properly disclosed factor of high percentage of self-performed work by the prime contractor would also have allowed NEWIMAR to emphasize the relevancy of its current work and explain how the nature of the scope of work activities . . . .").  Newimar provides no evidence to support these hypotheticals, and mere assertions from counsel about what the contractor may have done are insufficient to establish prejudice.  *See Data Gen. Corp.*, 78 F.3d at 1563 (finding no prejudice where protestor "presented no evidence — not even a company executive affidavit — that at any time it would have reduced its price to compete more effectively").  Additionally, Newimar could have "discovered by reasonable and customary care" the broad definitions of the Revised Solicitation's "depth and breadth" and "percentage of self-performed work" criteria.  *Per Aarsleff A/S v. United States*, 829 F.3d 1303, 1313 (Fed. Cir. 2016) (quoting *Analytical & Rsch. Tech., Inc.*, 39 Fed. Cl. at 46).  Accordingly, Newimar was required to lodge any challenge of those terms in a pre-award protest.  *Per Aarsleff*, 829 F.3d at 1313.

Newimar also argues that the Navy's decision not to give extra weight to Newimar's incumbency was "directly prejudicial to NEWIMAR."  Pl.'s Reply at 22.  However, as explained above, the Navy was not obligated to give extra weight for incumbency.  Newimar's unspecific allegations that it was prejudiced by the Navy's procurement process fail to establish that Newimar was in the "zone of active consideration" for the award but for the Navy's alleged errors.  *Allied Tech. Grp., Inc.*, 649 F.3d at 1326 (quoting *Statistica*, 102 F.3d at 1581).

Finally, even if this Court were to conduct its own prejudice analysis, Newimar could not have met its burden, as J&J would still have had an advantage for Factor 1.  Although the Navy

gave Newimar and J&J the same "Outstanding" adjectival rating for Factor 1, the Navy referenced

five rationales for giving J&J a "slight advantage," only three of which Plaintiff challenges here:

(i) "greater breadth of experience," (ii) self-performance, and (iii) incumbency. [17]  Tab 58 at AR

13227-28; Tab 59 at 13232-34; *see* Pl.'s Mem. at 11.  Assuming that all three challenged findings

were arbitrary and capricious and are "removed from consideration," J&J would still have an

advantage over Newimar for Factor 1 given the Navy's two other rationales for giving J&J a "slight

advantage" remain unchallenged and the Administrative Record does not reflect a rationale for

giving Newimar an advantage over J&J for Factor 1.  *Acad. Facilities Mgmt.*, 87 Fed. Cl. at 471.

While the Navy may have considered other elements under Factor 1 if the three rationales Newimar

challenges were eliminated, it is speculative to assume which other elements the Navy may have

considered and which bidder those additional elements would favor.  It is entirely possible those

additional elements would also have weighed in J&J's favor.   Considering such speculative

circumstance, it is certainly not this Court's role to substitute its judgment for the Navy's under

the circumstances present here.  *Cubic Applications*, 37 Fed. Cl. at 342. Accordingly, even under

the most generous analysis, Plaintiff could not show that "but for" the agency's errors it had a

"substantial chance" of winning the award.  *Banknote Corp. of Am.*, 56 Fed. Cl. at 387.

Further, even assuming, *arguendo*, that Newimar would have an advantage over J&J on

Factor 1 after removing the challenged rationales, Newimar would still fail to demonstrate

prejudice because the Revised Solicitation indicates that "Factor 1 is of equal in [sic] importance

to the past performance evaluation/performance confidence assessment Factor 4."  Tab 50 at AR

10723.  Given the Navy determined that "J&J held a significant advantage over Newimar for

---

[17] Plaintiff does not challenge the Navy's more favorable treatment given to J&J for (1) its  more recent projects and (2) its performance of services in a medical treatment facility for which the Revised Solicitation indicated would receive more weight.  Tab 58 at AR 13227-28; Tab 59 at 13232-34; *see* Pl.'s Mem. at 11.

Factor 4," any advantage for Newimar on Factor 1 would become immaterial when balanced against J&J's "significant advantage" for Factor 4.  Tab 58 at AR 13227-28.

Carrying the hypothetical even further for Newimar by assuming that Newimar and J&J's non-price factors were equivalent, Newimar still would not have a substantial chance of award as the Revised Solicitation dictates that although non-price factors are significantly more important than price, "[t]he importance of price will increase if the Offerors' non-price proposals are considered essentially equal in terms of overall quality."  Tab 50 at AR 10723, 10730-31. Therefore, even if Plaintiff had prevailed on all its Factor 1 challenges, *and* the Navy found that Newimar was superior on Factor 1, *and* found that Newimar's Factor 1 advantage made the bidders essentially equivalent on non-price factors despite J&J's Factor 4 advantage, the Navy still would have selected J&J because of its lower price.  *See* Tab 59 at AR 13234 ("Newimar's validated price of $145,744,676.24, is $12,820,143.33 or 9.64% higher than J&J's validated price of $132,924,532.91.").  Accordingly, this Court must dismiss Newimar's claim that the Navy's application of the Revised Solicitation's terms was arbitrary and capricious.

IV.   The Navy Performed an Adequate Best-Value Analysis.

Next, Newimar argues that the Navy failed to perform "a tradeoff analysis in accordance with the FAR and the Revised Solicitation in order to arrive at the decision to award the Contract to J&J."  Pl.'s Mem. at 15-16.  Although Newimar acknowledges that the Navy explained during debriefing that it carried out just such an analysis, Newimar essentially alleges that the Navy lied. *See* Pl.'s Reply at 23 ("The Government's recitation is a poor excuse to hide the fact that the Navy told NEWIMAR expressly that it performed a trade-off when it knew that it did not do so."). Instead, Newimar argues, any tradeoff analysis "if in fact it was performed, was incorrect because it failed to follow the FAR requirements and was completely unexplained since J&J submitted a price offer that was lower than the offer submitted by NEWIMAR."  Pl.'s Mem. at 16.  Newimar

further faults the Navy for ignoring unbalanced pricing in J&J's proposal and for deviating from its analysis of the original proposals.  *Id.* at 16-17.  Each argument lacks merit.

The Navy clearly performed the best-value analysis required by the Revised Solicitation and the FAR.  The Revised Solicitation reserved the right "to award the contract to the offeror submitting the proposal determined to represent the best value — the proposal most advantageous to the Government, price and other factors considered."  Tab 50 at AR 10730.  It further stated that the "tradeoff process" was appropriate for the acquisition.  *Id.*  "The Government considers it to be in its best interest to allow consideration of award to other than the lowest priced offeror or other than the highest technically rated offeror."  *Id.*  When using a tradeoff process, "[t]he perceived benefits of the higher priced proposal shall merit the additional cost, and the rationale for tradeoffs must be documented in the file."  FAR 15.101-1(c).  The documentation also "shall include the rationale for any business judgments and tradeoffs made or relied on by the [source selection authority], including benefits associated with additional costs."  FAR 15.308.

Notwithstanding the contracting officer's statement to Newimar in debriefing that "[t]he Government conducted a tradeoff," Tab 72  ( Agency Response – Newimar Debriefing Questions (September 10, 2021) at AR 14781, this procurement did not require a tradeoff.  A best-value tradeoff analysis is not required, as here, when the contracting agency selects the bid with the highest technical rating and lowest price.  *Technik, Inc. v. United States*, 137 Fed. Cl. 764, 771 (2018).  Here, the SSA noted "that Newimar's validated price of $145,744,676.24, is $12,820,143.33 or 9.64% higher than J&J's validated price of $132,924,532.91."  Tab 59 at AR 13234.  The SSA further agreed with the SSAC's determination that J&J had slightly better corporate experience than Newimar, that J&J's past performance was significantly better than Newimar's, and that Newimar and J&J were equal on other non-price factors.  *Id*. at AR 13233-

34.   Because J&J's offer exceeded Newimar's in most categories, and was no worse than Newimar's in others, the SSA concluded that "J&J's proposal represents the best value to the Government of these two offerors." *Id.* at 13234.  This reasoned conclusion left no room for a tradeoff as none of the factors weighed in Newimar's favor.

Newimar's complaints about the SSA's decision to look beyond the adjectival ratings do not create such room.  Even though Newimar and J&J received equal adjectival ratings on the non-price factors, J&J still had a significantly lower price.  Tab 57 at AR 12877; Tab 59 at AR 13231. Akin to a scenario where one bidder offers the best technical and price terms, no tradeoff is needed when the proposals are technically equal.  *See, e.g.*, *Carahsoft Tech. Corp. v. United States*, 86 Fed. Cl. 325, 349 (2009) ("This court has previously recognized that where proposals are technically equal, a best-value tradeoff analysis between price and technical factors is not required." (citing *Consol. Eng'g Servs., Inc. v. United States*, 64 Fed. Cl. 617, 635 n.26 (2005))).

Newimar's argument that the Navy had to justify its award to J&J considering unbalanced pricing in J&J's proposal fails because, as discussed in more detail below, the Navy reasonably concluded that J&J's proposal was not unbalanced.  A derivative best-value challenge cannot stand on a rejected challenge to another aspect of the agency's evaluation.  *See Ace-Federal Reporters, Inc. v. United States*, 150 Fed. Cl. 94, 122 (2020) (rejecting a protestor's argument that the ITC's best value determination was tainted by the ITC's arbitrary and capricious evaluation of the technical and past performance factors since the court found that "the ITC's evaluation of the technical and past performance factors was rational").

Finally, Newimar has not shown that the Navy committed any error by ignoring the results of the best value analysis that it undertook when reviewing the parties' original proposals.  The Navy took corrective action and withdrew its initial contract award.  *Newimar v. United States*,

Case No. 20-1724, ECF No. 38.  This Court may only review the procurement decision before it, and Newimar has not identified any error in the Navy's best value analysis here.  Newimar "bears a significant burden to demonstrate error in the [Navy's] tradeoff analysis, because procurement officials have a very high degree of discretion when it comes to best value determinations." *One Largo v. United States*, 109 Fed. Cl. 39, 96 (2013).  Newimar does not meet that burden here.

V.  <u>The Navy Properly Evaluated Price Reasonableness</u>.

Newimar makes several unsuccessful volleys at the Navy's reasonableness analysis.  Its principal attack is that "the Navy erred in using the general price competition rule to conclude that the J&J Revised Proposal was fair and reasonable," when "the J&J Revised Proposal total price was 9.64% lower than the NEWIMAR Revised Proposal total price." Pl.'s Mem. at 20.  According to Newimar, "this significant differential should have prompted the [Price Evaluation Team] to conduct an analysis to determine whether the J&J Revised Proposal could possibly still fall within the competitive range as established under FAR § 15.306(a)(1) or at least what caused the large price decrease, but it took no such action." *Id.* at 19.  Next, Newimar complains that the Navy ignored the increased delta between the IGCE and J&J's proposal, from 2.79% lower in J&J's original proposal to 14% lower in its revised proposal.  *Id.* at 22.  Finally, and for the first time in its reply brief, Newimar complains that the Navy did not conduct its price reasonableness analysis in accordance with the Source Selection Plan (SSP) because it did not comply with the standards in DFARS 215.404.  Pl.'s Reply at 23.

Newimar misunderstands what the Navy was required to analyze for price reasonableness.  "[C]ontracting officers are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process." *DynCorp Int'l, LLC v. United States*, 10 F.4th 1300, 1310-11 (Fed. Cir. 2021) (quoting *Impresa*, 238 F.3d at 1332).  That discretion includes the freedom to choose a price analysis technique under FAR 15.404-1(b)(3) that the contracting officer finds

appropriate for the procurement.  *DynCorp*, 10 F.4th. at 1310.

Here, the Revised Solicitation indicated that the Navy would analyze price using one or more of the following techniques:

> i.   Comparison of proposed prices received in response to the RFP.
> ii.  Comparison of proposed prices with the IGCE.
> iii. Comparison of proposed prices with available historical information.
> iv.  Comparison of market survey results.
> v.   Fair and reasonable CLIN and ELIN/unit pricing.

Tab 50 at AR 10731.  The FAR expressly mentions these techniques as permissible price analysis techniques.  *See* FAR 15.404-1(b)(2).  The Navy selected two of those techniques, and reasonably concluded that J&J's and Newimar's proposals were fair and reasonable because it found "adequate price competition" and both proposals were less than the IGCE.  Tab 57 at AR 12883; *see also* Tab 58 at AR 13225-26 (confirming that the offerors' prices were fair and reasonable because of adequate price competition and comparing the offerors' prices to the IGCE and to each other); Tab 59 at AR 13231-32; Tab 61 at AR 13433.  Newimar's attacks on the Navy's conclusion fall short.

A.    The Navy Properly Applied the Evaluative Techniques It Selected to Analyze Price Reasonableness.

Newimar agrees that the Navy analyzed price reasonableness using "techniques and procedures [that] were permitted under FAR § 15.404-1 and were set forth in the terms of the Revised Solicitation" but argues that the Navy did not adequately perform those techniques.  Pl.'s Reply at 26-27.  Specifically, Newimar argues that:

> (1) the Navy failed to consider DFARS § 215.404 in accordance with the Revised Solicitation; (2) the Navy improperly found adequate price competition because the Navy's price was inconsistently low compared to NEWIMAR's price and the IGCE; and (3) the Navy failed to identify, much less examine with specificity, the massive inconsistencies in total price between J&J's Revised Proposal, NEWIMAR's Revised Proposal, and the IGCE.

*Id.* at n.11.  This Court disagrees.  The Navy reasonably concluded that J&J's price was reasonable

based on adequate price competition and comparison with the IGCE.  That is sufficient to satisfy the Navy's obligation to analyze price reasonableness.

              i.      <u>Adequate Price Competition</u>

Newimar first attacks the Navy's use "of FAR § 15.404-1(b)(2)(i) to hold that the price competition between the J&J Revised Proposal and Newimar's Revised Proposal meant both bids were fair and reasonable."  Pl.'s Mem. at 20.  According to Newimar, *Serco Inc. v. United States*, 81 Fed. Cl. 463 (2008), precludes an offeror from relying on adequate price competition to establish a fair and reasonable price if that offeror's price is inconsistent with those of other competitors in any manner.  *See* Pl.'s Mem. at 19-20.  However, even putting aside that this Court is not bound by *Serco,* Newimar's interpretation ignores the factors that led the *Serco* court to deviate from the general rule that "adequate price competition establishes a fair and reasonable price."  FAR § 15.404-1(b)(2)(i).  The direction of inconsistency — whether the price deviated up or down from competitors — and magnitude of inconsistency between the prices in *Serco* were essential to that court's conclusion that adequate price competition alone was insufficient to establish price reasonableness.  *Serco*, 81 Fed. Cl. at 490-96.  In contrast, J&J's price was unexceptional concerning price and magnitude inconsistency, making it unnecessary to deviate from the general rule that adequate competition establishes price reasonableness.  *See id.* at 494-96.

Newimar mistakenly reads *Serco* to prohibit price deviation regardless of whether that deviation is above or below competitors' prices.  Price reasonableness, however, does not hinge solely on price consistency.  "[T]he rule is that, to be found fair and reasonable in comparison with other proposed prices, the price being assessed *either* must be consistent with those other prices *or* favorably compare with those other prices."  *Determining That A Price Is Fair And Reasonable:*

*Is Adequate Price Competition Enough?*, 33 Nash & Cibinic Rep. NL ¶ 36 (2019) (emphases added). As "[t]he purpose of a price reasonableness analysis is to ascertain that the Government is not paying too high a price," the phrase "favorably compare" means that the price maybe be reasonable by being lower. *Serco*, 81 Fed. Cl. at 494 n.48 (quoting *Cost and Price Analysis: Understanding the Terms*, 9 No. 1 Nash & Cibinic Rep. ¶ 5 (1995)). Here, J&J's price favorably compares to Newimar's as "J&J submitted the lowest awardable price proposal." Tab 57 at AR 12883. That makes its price reasonable.

Contrary to Newimar's argument "that if the *Serco* court wished to limit the rule's application to circumstances where a proposed price is higher than other bids then the court would have done so," Pl.'s Reply at 27, "prior decisions do not establish controlling precedent on an issue 'never squarely addressed.'" *Caquelin v. United States*, 959 F.3d 1360, 1372 (Fed. Cir. 2020) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993)). *Serco* did not squarely address whether a price is unreasonable if it deviates below that of other offers. Instead, that case merely held that an agency's price reasonableness determination is inadequate if it does not compare prices to identify outliers. *See Serco*, 81 Fed. Cl. at 494 (explaining that "the favorable comparison of a given offeror's price to those of the other contestants," not merely competition, provides the assurance that a price is fair and reasonable). *Serco* simply does not suggest that price reasonableness is more than a test to weed out excessively high prices.

Even if this Court were to agree that *Serco* requires eliminating "inconsistent" prices that are lower than those of competitors, this case remains distinguishable from *Serco* as the Navy compared the offerors' prices and concluded that J&J's price was not an outlier. The agency in *Serco* concluded that an offer lower than the IGCE and "'within one standard deviation' to the mean" was equally as fair and reasonable as an offer that was "'above' the IGCE and 'outside two

standard deviations' to the mean." *Serco*, 81 Fed. Cl. at 495.  It was this blind attribution of reasonableness in the face of statistical evidence — that prices were more than two standard deviations above the mean  "suggesting that they were truly outliers" — that led the court to hold the agency's price reasonableness analysis improper.  *Id.* at 492.  In contrast, J&J's price was 9.64% below Newimar's.  Tab 57 at AR 12883.  Other judges have rejected complaints of improper price reasonableness determinations involving even greater price deviation.  *See, e.g.*, *XL Assocs., Inc. v. United States*, 155 Fed. Cl. 726 (2021) (approving an agency's price reasonableness determination based on adequate competition when the winning offer was 14.49% less than the protestor's offer).  Thus, the Navy acted well within its discretion when it concluded that J&J's price deviation, below Newimar's, was reasonable.

Finally, this Court is unpersuaded by Newimar's arguments regarding the "large change" between J&J's original proposal, that was 2.3% higher than Newimar's original proposal, and J&J's revised proposal, that was 9.64% lower than Newimar's revised proposal.  Pl.'s Mem. at 20.  Neither FAR 15.404-1(b) nor the RFP list comparison of revised proposals to previous proposals as an approved technique for analyzing price reasonableness.  *See* Tab 50 at AR 10731.  The Navy also specified that it would not evaluate information in previous proposals, which necessarily precluded comparisons to previously-submitted prices in the parties' original proposals.  Tab 52 at AR 11370.  The Navy's reliance on adequate price competition based solely on the prices submitted in their revised proposals adequately established price reasonableness in accordance with the Revised Solicitation and the FAR.

     ii.  <u>Comparisons to an Independent Government Cost Estimate (ICGE)</u>

The Navy's comparison of offers to an IGCE gives this Court another reason to reject Newimar's argument that the Navy failed to conduct a proper price reasonableness analysis.  The

FAR explicitly endorses "[c]omparison of proposed prices with the IGCE" as a technique for ensuring a fair and reasonable price. FAR 15.404-1(b)(2)(v). The Revised Solicitation put offerors on notice that price reasonableness might be evaluated based on a comparison with an IGCE. *See* Tab 50 at AR 10731. The Navy's price evaluation indeed compared both Newimar's and J&J's prices to the IGCE. Tab 57 at AR 12883. Rather than disregard a "massive price differential between the J&J Revised Proposal and the IGCE total price," Pl.'s Mem. at 22 — as Newimar contends — the Administrative Record reflects that the Navy determined J&J's price offered a 14% discount from the IGCE, concluding that was a fair and reasonable price. *See* Tab 57 at AR 12883 (finding that J&J's offer was 14% below the IGCE and Newimar's offer was 5.71% below the IGCE). Newimar's complaints "are nothing more than mere disagreement with the Agency's reasonable exercise of its considerable discretion." *Vertex Aerospace, LLC v. United States*, No. 20-700C, 2020 WL 5887750, at *10 (Fed. Cl. Sept. 21, 2020); *see Serco*, 81 Fed. Cl. at 495 ("[T]he depth of an agency's price reasonableness analysis and its ultimate findings on that count are both matters of discretion."). As the Navy rationally concluded that J&J's price was reasonable in comparison the IGCE, this Court will not interfere with the Navy's exercise of discretion.

B.    Newimar Improperly Seeks a Price Realism Analysis.

Rather than identify a flaw in the Navy's price reasonableness analysis, Newimar appears to seek a price realism analysis, which the Navy was not permitted to perform. Price realism is the inverse of price reasonableness; it involves analysis for prices that are too low. *Asset Prot. & Sec. Servs., L.P. v. United States*, 5 F.4th 1361, 1363 (Fed. Cir. 2021). The government uses price realism analysis to "investigate[] whether the contractor is proposing a price so low that performance of the contract will be threatened." *EMTA Isaat, A.S. v. United States*, 123 Fed. Cl. 330, 338 n.9 (2015) (quoting *DMS All–Star Joint Venture v. United States*, 90 Fed. Cl. 653, 657

n.5 (2010)).   Newimar explicitly relies on this concern to prop up its "price reasonableness" arguments.  *See* Pl.'s Mem. at 29 ("The significant underpricing, which is obvious when compared to the IGCE, will force J&J to use lower quality materials and equipment so that it can remain under budget"), 30 (arguing that underpricing risks also apply "to the Navy that will incur huge overpayments if it orders certain items to be performed"); Pl.'s Reply at 28 (arguing that "the lower price of the J&J Revised Proposal carries with it significant performance risks that are not present in NEWIMAR's Revised Proposal").   Although Newimar robes its arguments with price reasonableness terminology, what stands before this Court once Newimar's logic is laid bare is a price realism argument.

This Court must reject Newimar's argument.  "In accordance with the well-established principle that an agency must evaluate proposals in accordance with the solicitation terms, it is improper for an agency to conduct a price realism analysis in a fixed-price procurement when the solicitation does not expressly or implicitly require a price realism analysis because such an analysis would employ unstated evaluation criteria."  *UnitedHealth Mil. & Veterans Servs., LLC v. United States*, 132 Fed. Cl. 529, 561 (2017).[18]  This action involves a fixed-price procurement.  *See* Tab 50 at AR 10688 ("This acquisition will result in the award of a single award Firm Fixed Price (FFP), Indefinite Delivery-Indefinite Quantity (IDIQ), performance-based type contract.").  The Revised Solicitation does not call for using a price realism analysis.  *Id*. at AR 10687-733.  While a solicitation may implicitly authorize a price realism analysis by stating that the agency

---

[18] Price realism is not ordinarily considered in fixed-price contract solicitations as "a fixed-price contract assigns the risk of loss to the contractor."  *Navarro Rsch. and Eng'g, Inc. v. United States*, 151 Fed. Cl. 184, 196 (2020).  Thus, this Court is not concerned here that "J&J is fully bound to perform the entirety of the Contract under [alleged] budgetary restrictions, and [that] the risks posed by the [alleged] underpricing will be present for the entirety of the contract with no possible escape."  Pl.'s Mem. at 30.  That is precisely the balance of risk expected in contracts like the one at issue here.

may factor into its analyses whether a given price is too low, *see UnitedHealth*, 132 Fed. Cl. at

562-63 (collecting cases), the Revised Solicitation in this procurement does not mention anything

suggesting that bids will be discounted if an offeror's price is too low.  *See* Tab 50 at AR 10687-

733.  The Navy, therefore, correctly did not perform a price realism analysis.

Newimar protests that "any restriction on the analysis options available to [the] Navy was

self-imposed."  Pl.'s Reply at 29.  However, that is how every government procurement works.

An agency issues a solicitation and then it evaluates bids in accordance with the terms of that

solicitation.  *See, e.g.*, *Banknote Corp. of Am.*, 56 Fed. Cl. at 386 ("It is hornbook law that agencies

must evaluate proposals and make awards based on the criteria stated in the solicitation.").  If

Newimar believed that "[t]he Navy custom-built the terms of the Revised Solicitation from top to

bottom" so that it could "ignore extreme anomalies," it should have challenged the terms of the

Revised Solicitation in a pre-award protest.  Pl.'s Reply at 29.  As the Federal Circuit has

explained, "where there is a 'deficiency or problem in a solicitation . . . the proper procedure for

the offeror to follow is not to wait to see if it is the successful offeror before deciding whether to

challenge the procurement, but rather to raise the objection in a timely fashion.'"  *Blue & Gold*

*Fleet*, 492 F.3d at 1314 (quoting *N.C. Div. of Servs. for the Blind v. United States*, 53 Fed. Cl. 147,

165 (2002)).  Having acquiesced to the terms of the Revised Solicitation, Newimar cannot now

complain that the Navy followed through on its obligation to evaluate the bids according to the

Revised Solicitation's terms.

C.     DFARS 215.404 Is Inapplicable to This Procurement.

Newimar attempts to circumvent that it improperly seeks a price realism analysis by

arguing, for the first time in its reply, that the Navy was required to analyze the reasonableness of

J&J's pricing under DFARS 215.404.  *See* Pl.'s Reply at 25; *see generally* Pl.'s Mem.  According

to Newimar, the SSP's statement that "[i]n accordance with FAR 15.404-1 and DFARS 215.404, [the price evaluator] conducts price analysis of each proposal using the evaluation factor in the SSP and solicitation," required the Navy to conduct is price reasonableness analysis in accordance with DFARS § 215.404.  Pl.'s Reply at 23 (alteration in original) (quoting Tab 49 (Addendum 004 – Source Selection Plan (May 14, 2021)) at AR 10653).  DFARS 215.404 requires contracting officers to evaluate, among other things, "[t]he expected reliability of the contractor's cost estimates (including the contractor's cost estimating system); . . . [and] (vii) [a]ny other factors that affect the contractor's ability to meet the cost targets (e.g., foreign currency exchange rates and inflation rates)."  DFARS 215.404-71-2(e)(1)(v).  Newimar argues that if the Navy evaluated such factors when considering J&J's proposal "it would have determined that the proposal's total price is not reliable because it is so much lower than the IGCE and the NEWIMAR Revised Proposal prices."  Pl.'s Reply at 24.

To begin, Newimar waived this argument by not raising it in its MJAR.  *See Novosteel*, 284 F.3d at 1274.  Even assuming, *arguendo*, that Newimar implicitly raised this argument in its MJAR, this Court still could not sustain Newimar's protest because DFARS 215.404-71-2 is inapplicable to this procurement, and neither the SSP nor the Revised Solicitation list DFARS 215.404-71-2 as an applicable factor.

Newimar rests its DFARS argument on the Weighted Guidelines Method for profit analysis described in DFARS 215.404-71; however, that subpart of DFARS 215.404 is inapplicable to this procurement.  The DFARS provides three structured approaches for profit analysis, including the Weighted Guidelines Method, in DFARS 215.404-4(b)(1).  A contracting officer is only required to "use a structured approach for developing a prenegotiation profit or fee objective on any negotiated contract action when certified cost or pricing data is obtained."  DFARS 215.404-

4(b)(1).  The Navy did not request or obtain "certified cost or pricing data" in this procurement.  *See* Tab 50 at AR 10723-26.  Indeed, the Navy could not require the bidders to provide "certified cost or pricing data" because the contracting officer determined that the proposed prices were based on adequate price competition.  *See* FAR 15.403-1(b) (listing circumstances in which "[t]he contracting officer shall not require certified cost or pricing data to support any action"); Tab 58 at AR 13225 (concluding that "the prices submitted established adequate price competition").  The lack of "certified cost or pricing data" makes DFARS 215.404-71 wholly inapplicable.

Additionally, the SSP's reference to DFARS 215.404 does not require compliance with DFARS 215.404-71.  First, this argument cannot sustain Newimar's protest because "source selection plans and other internal documents are guidelines that do not give any rights to offerors." *Allied Tech. Grp., Inc.*, 94 Fed. Cl. at 41.  Even if Newimar could demonstrate that the terms of the SSP created any enforceable rights, the SSP only required the contracting officer to perform a "price analysis of each proposal" consistent "with FAR 15.404-1 and DFARS 215.404."  Tab at 49 at AR 10653.  The Weighted Guidelines Method described in DFARS 215.404-4 is a "cost analysis" method.  *See* DFARS 215.404-4(b)(1) ("Contracting officers shall use a structured approach for developing a prenegotiation profit or fee objective on any negotiated contract action when certified cost or pricing data is obtained . . . .").  "Cost analysis" and "price analysis" are distinct concepts in the FAR and DFARS.  *See* DFARS 215.403-1(c)(1)(A)(2)(ii) (referencing the FAR for an explanation of "price analysis"); *compare* FAR 15.404-1(c)(1) ("Cost analysis is the review and evaluation of any separate cost elements and profit or fee in an offeror's or contractor's proposal"), *with* FAR 15.404-1(b)(1) ("Price analysis is the process of examining and evaluating a proposed price without evaluating its separate cost elements and proposed profit.").

In sum, Newimar's disagreement with the Navy's price reasonableness analysis falls well short of establishing that the Navy acted arbitrarily or capriciously. The Navy rationally found that J&J's price was reasonable based on adequate competition in this procurement and based on comparisons to an IGCE. Newimar's mere disagreement with the Navy's conclusion drawn from those exercises cannot sustain a protest.

VI.    The Navy Reasonably Concluded That J&J's Pricing Is Not Unbalanced.

Newimar's final protest ground seeks to undermine the Navy's conclusion that J&J's pricing is not unbalanced. Specifically, Newimar argues that it was arbitrary and capricious for the Navy to focus exclusively on the allocations to recurring and on-recurring work CLINS. Pl.'s Reply at 30; *see also* Pl.'s Mem. at 29-30. It further argues that significant price deviations between the work allocated to recurring and non-recurring work CLINS render J&J's pricing unbalanced. Pl.'s Mem. at 29-30. According to Newimar, each defect is sufficient to trigger the Navy's obligation under FAR § 15.404-1(g)(2) to evaluate the unbalanced pricing for materiality. Pl.'s Mem. at 30. Newimar may disagree with the Navy's conclusion on the issue of balanced pricing, but "the Court's role here is not to test whether there is a better, faster, or otherwise 'more correct' way to analyze unbalanced pricing; rather, it is the Court's task to determine whether the Navy's unbalanced pricing analysis is reasonable and its conclusions rational." *IAP World Servs., Inc. v. United States*, 153 Fed. Cl. 564, 567 (2021). The Court finds the Navy's price balancing analysis reasonable and its conclusion that J&J's pricing is not unbalanced to be rational.

A.    The Navy Reasonably Chose to Analyze Unbalanced Pricing by Comparing Recurring and Non-Recurring Work CLINs.

Newimar begins its attack on the Navy's conclusion that J&J's pricing is not unbalanced by listing 13 examples of "individually underpriced and overpriced [non-recurring work] ELINs," that it alleges could individually "and all of them cumulatively, render the J&J Revised Proposal

unbalanced." Pl.'s Mem. at 24-26. It argues that the Navy's decision to ignore these price differences via sole focus on CLIN-level pricing "must be deemed arbitrary and capricious because the analysis failed to examine all relevant data that was available." Pl.'s Reply at 30. Furthermore, Newimar argues that the Navy was "bound to" examine ELIN pricing "by its own explicit instructions," the FAR, and U.S. Court of Federal Claims precedent. *Id*. at 31. This Court disagrees.

In procurements like this, where offers have "separately priced line items or subline items," the procuring agency must analyze the offers "to determine if the prices are unbalanced." FAR § 15.404-1(g)(2). Prices are unbalanced "when, despite an acceptable total evaluated price, the price of one or more line items is significantly over or understated as indicated by the application of cost or price analysis techniques." FAR § 15.404-1(g)(1). The FAR, however, does not require any specific price analysis technique. *See id.* U.S. Court of Federal Claims judges have consistently explained that "[t]he depth of an agency's price analysis is a matter within the sound exercise of the agency's discretion and we will not disturb such an analysis unless it lacks a reasonable basis." *Logistics Health, Inc. v. United States*, 154 Fed. Cl. 51, 83 (2021) (quoting *Biospherics, Inc. v. United States*, 48 Fed. Cl. 1, 10 (2000)). Given that discretion, the "proper inquiry" for assessing the agency's chosen technique for evaluating price balancing is "whether there is any statutory or regulatory provision that precludes such use." *Tyler Constr. Grp. v. United States*, 570 F.3d 1329, 1333 (Fed. Cir. 2009). It bears repeating that "the Court's role here is not to test whether there is a better, faster, or otherwise 'more correct' way to analyze unbalanced pricing; rather, it is the Court's task to determine whether the Navy's unbalanced pricing analysis is reasonable and its conclusions rational." *IAP World Servs.*, 153 Fed. Cl. at 567.

The Navy's decision to analyze for unbalanced pricing by examining CLIN-level pricing was reasonable.  Unbalanced pricing analyses seek to uncover a "pricing scheme in which the offeror overbids the most likely work and underbids the less likely work with the hope that the less likely work is never ordered, which generates a windfall for the offeror." *Id.* at 570 n.3.  The Navy did just that by comparing the relative RW:NRW percentages (or ratios) between J&J's proposal and the IGCE.  Tab 57 at AR 12884-86.  Newimar did not, and cannot, point to any law or regulation prohibiting this technique.  *See generally* Pl.'s Mem.; Pl.'s Reply.  Indeed, U.S. Court of Federal Claims decisions have approved of similar techniques.  *See, e.g., IAP World Servs.*, 153 Fed. Cl. at 567-72 (endorsing the Navy's assessment of unbalanced pricing at the CLIN level, rather than the ELIN level, in a fixed-price procurement).  While there may have been other ways for the Navy to analyze for unbalanced pricing, this Court will not usurp the Navy's discretion to select its price unbalancing analysis method when there is no "statutory or regulatory provision that precludes [its] use." *Tyler Constr.*, 570 F.3d at 1333.

Notwithstanding the lack of any law prohibiting the type of analysis performed by the Navy here, Newimar argues that "the language in FAR § 15.404-1(g), in conjunction with relevant case law," implicitly requires analysis of ELIN-level pricing for balance when that information is available to the government.  Pl.'s Reply at 32.  With respect to the FAR's language, Newimar argues that "[i]t defies logic to conclude that CLINs, which are not expressly mentioned as 'line items' for purposes of FAR § 15.404-1(g), constitute 'line items' but yet ELINs (Exhibit Line Items) do not." *Id.* at 33.  However, ELINs — as used in the federal regulations and in this procurement — do not constitute "the basic structural element in a procurement instrument that describes and organizes the required product or service for pricing, delivery, inspection, acceptance, invoicing, and payment." FAR § 2.101 (defining "line item").  Words in a regulation

are given their ordinary meaning.  *See BP Am. Prod. Co. v. Burton*, 549 U.S. 84 (2006) ("Unless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning.").  "Basic" means "pertaining to, or forming a base; fundamental, essential."  *Basic*, OXFORD ENGLISH DICTIONARY (1989).  ELINs are not "a base" or "fundamental" as they depend upon CLINs or subline item numbers (SLINs).  *See* DFARS/PGI § 204.7105(a)(2) ("When using exhibits, establish a contract line or subline item and refer to the exhibit.").  Consistent with this interpretation, the Revised Solicitation referred to the "basic contract award" as a list of 20 CLINs.  Tab 49 at AR 10641-62.  Newimar's interpretation of FAR § 15.404-1(g) ignores the plain language of the statute.

The relevant case law also does not support Newimar's construction of FAR § 15.404-1(g).  Newimar argues that the decision in *Al Ghanim Combined Grp. Co. Gen. Trad. & Const. W.L.L. v. United States*, 56 Fed. Cl. 502 (2003), makes it "clear that the Navy's decision to evaluate unbalanced pricing strictly on a CLIN level must be deemed arbitrary and capricious because the analysis failed to examine all relevant data that was available."  Pl.'s Reply at 30.  Newimar reads too much into *Al Ghanim*.  Rather than state that the court has an obligation to ensure that the agency factored all information available to it into its decision, the court echoed the rule that "the court's inquiry must focus on whether the agency 'examined *the relevant* data.'"  *Al Ghanim*, 56 Fed. Cl. at 507 (quoting *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto Ins.*, 463 U.S. 29, 43 (1983)).  In that case, the "relevant data" were the CLINs.  *See Al Ghanim*, 56 Fed. Cl. at 520 (explaining that "the Corps violated an applicable procurement regulation by failing to compare the CLIN prices submitted by the offerors with the unit prices in the government estimate").  *Al Ghanim* does not require the agency to analyze *all* data available to it, only the *relevant* data.  In this case, as in *Al Ghanim*, the "relevant data" are the CLINs.

Nor does *Logistics Health, Inc. v. United States*, 154 Fed. Cl. 51 (2021) support Newimar's view of FAR § 15.404-1(g). The only mention of ELINs in that case appears in a quote of the parties' briefing. *Logistics Health*, 154 Fed. Cl. at 84. There, the court held only that the "individual procedures," which the plaintiff argued were subline items, "were not line items or subline items of the solicitation" where the procedures were not designated as such and were included in an attachment rather than an exhibit. *Id.* at 86 (quotations omitted). It makes no mention of whether an ELIN, which as noted is distinct from a CLIN and a SLIN, constitutes a "subline item" under FAR § 15.404-1(g). *Id.* at 82-86. What *Logistics Health* squarely addressed, however, is "that '[t]he depth of an agency's price analysis is a matter within the sound exercise of the agency's discretion and [the Court] will not disturb such an analysis unless it lacks a reasonable basis.'" *Id.* at 85 (quoting *Worldwide Language Res., LLC. v. United States*, 127 Fed. Cl. 125, 134 (2016)). The Navy reasonably chose to analyze price balancing at the CLIN level, *see* Tab 57 at AR 12884-86, and the Court will not overturn that exercise of discretion.

    B.    <u>The Navy Reasonably Concluded that J&J's Pricing Was Not Unbalanced at the CLIN Level</u>.

Newimar also argues that price deviation at the CLIN level is sufficient to render J&J's pricing unbalanced. *See* Pl.'s Mem. at 23-24 (complaining that J&J's revised bid price only allocated 33.2% of the price to non-recurring work CLINs while the IGCE allocated 40.31% of the price to non-recurring work CLINs). Specifically, Newimar takes issue with the Navy's decision to compare recurring RW:NRW percentages between J&J's proposal and the IGCE, rather than compare the dollar differential between J&J's aggregate NRW price and the IGCE aggregate NRW price. *Id*. at 27. According to Newimar, the 7% difference between the J&J and IGCE allocations to non-recurring work CLINS was based "on basic percentages that are inadequate and misleading." *Id.* It contends that had the Navy instead reviewed the dollar amounts

allocated to non-recurring work, it would have found that J&J's revised proposal allocates 29.1% fewer dollars to non-recurring work than the IGCE.  *Id.*

While Newimar correctly calculates the difference in dollars between non-recurring work in J&J's proposal and the IGCE, it has not shown that such an analysis was required.  "There is nothing in the FAR that mandates a comparison of raw dollar values as opposed to comparing ratios so long as those ratios target the potential for unbalanced pricing."  *IAP World Servs.*, 153 Fed. Cl. at 571.  The Price Evaluation Team focused on comparisons "between Recurring and Non-Recurring Work CLINs" in order "to address the risks more likely to exist and more appropriately considered in the context of an unbalanced pricing analysis on a [firm fixed price] contract."  Tab 57 at AR 12884.  As the ratio method employed by the Navy was a reasonable method for identifying potentially unbalanced pricing, this Court will not disturb the Navy's conclusion that J&J's pricing was not unbalanced.

C.    A Materiality Analysis Was Unnecessary.

Finally, Newimar argues that "if the J&J Revised Proposal was deemed to be unbalanced, as it should have been, the J&J Revised Proposal would then become subject to the mandatory 'materiality' analysis set forth in FAR § 15.404-1(g)(2)."  Pl.'s Mem. at 28.  According to Newimar, underpricing will cause J&J to use low-quality materials, to "cut every corner possible when performing the work."  *Id*. at 29.  In turn, this will put laborers' safety at risk.  *Id.* at 30.  This Court, however, need not address whether J&J's price presents performance risks or whether the risks suggested by Newimar meet the materiality requirement of FAR § 15.404-1(g)(2).  The materiality requirement in that FAR provision is irrelevant where, as here, prices are not unbalanced.  *See IAP World Servs.*, 153 Fed. Cl. at 572 ("Here, the second step of the unbalanced pricing analysis was not triggered because no unbalanced pricing was identified, meaning that there was no basis for the Navy to conduct the risk analyses that [protester] calls for.").  This

Court's conclusion that the Navy properly evaluated price unbalancing ends the inquiry.

VII.   <u>Newimar Is Not Entitled to Injunctive Relief</u>.

The Court considers four factors when deciding whether to grant injunctive relief: (1) whether the plaintiff has succeeded on the merits, (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) whether the balance of hardships to the respective parties favors granting an injunction, and (4) whether the public interest is served by granting an injunction. *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009). This Court need not progress beyond the first factor. "A plaintiff who cannot demonstrate success upon the merits cannot prevail upon a motion for injunctive relief." *By Light Prof'l IT Servs., Inc. v. United States*, 131 Fed. Cl. 358, 367 (2017); *see Blue & Gold Fleet*, 492 F.3d at 1312 (noting that success on the merits is "the most important factor required to enjoin the award of a contract"). As discussed above, Newimar's protest fails on the merits. Accordingly, Newimar is not entitled to injunctive relief.

\* \* \* \*

<u>CONCLUSION</u>

For the reasons set forth above, this Court **DENIES** Plaintiff's Motion for Judgment on the Administrative Record (ECF No. 40), **GRANTS** Defendant's Cross-Motion for Judgment on the Administrative Record (ECF No. 47), and **GRANTS** Intervenor-Defendant's Cross-Motion for Judgment on the Administrative Record (ECF No. 48).  The Clerk of Court is **DIRECTED** to enter judgment accordingly.

The parties are directed to **CONFER** and **FILE** a Notice within seven days of this Memorandum and Order, attaching a proposed public version of this Sealed Memorandum and Order, with any competition-sensitive or otherwise protected information redacted.

IT IS SO ORDERED.

 s/Eleni M. Roumel
ELENI M. ROUMEL
Judge

May 12, 2022
Washington, D.C.